JENNIFER R. TULLIUS (BAR NO. 222763)
**TULLIUS LAW GROUP,**
**a Professional Corporation**
515 S. Flower Street, 18th Floor
Los Angeles, CA  90071
Telephone: 213-787-5958
Facsimile: 213-674-4364
Email: jtullius@tulliuslaw.com

Attorneys for Secured Lender:
PMF CA REIT, L.L.C.

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

In re:

**IMPACT ENERGY PARTNERS LLC,**

      Debtor and Debtor-in-
      Possession.

Case No. 22-30476 HLB

Chapter 11

Date:  October 25, 2022
Time: 11:00 a.m.
Place: Video/Teleconference - Zoom

Judge: Hannah L. Blumenstiel

**PARTIAL JOINDER BY SECURED CREDITOR PMF CA REIT, L.L.C.
TO THE UNITED STATES TRUSTEE'S
MOTION TO DISMISS OR CONVERT CHAPTER 11 CASE;
DECLARATION OF JENNIFER R. TULLIUS IN SUPPORT THEREOF**

Secured Lender PMF CA REIT, L.L.C. ("**Lender**") respectfully submits the following

partial joinder ("**Joinder**") to the United States Trustee's Motion Pursuant to 11 U.S.C. §

1112(b) and Federal Rules of Bankruptcy Procedure 1017(f) and 9014, to Dismiss or Convert

Chapter 11 Case (the "**Motion**") and in response to the Opposition ("**Opposition**") filed by

Impact Energy Partners LLC's ("**Debtor**") in response thereto.

      Lender is filing this Joinder to provide the Court and interested parties with additional

facts and information that may assist in evaluating the relief request by the United States Trustee

(the "**UST**") in the Motion.  In addition, Lender is filing this Joinder to correct serious and

apparently intentional misstatements of fact made by the Debtor and its counsel in the

Opposition and supporting Declarations.

Lender holds the senior security interests on both of the Debtor's real properties (which properties appear to be the only assets of the Debtor in this case). Although significantly misstated by the Debtor in its Schedules, Lender's secured claims as of the Petition Date are as follows:

- 275 Long Ranch – amount due in excess of $14,300,000 as of the Petition Date. To the extent that Lender is over-secured, default interest (~$7,000/day), attorneys' fees and costs continue to accrue.

- 432 Lovell – amount due in excess of $7,290,000 as of the Petition Date. To the extent that Lender is over-secured, default interest (~$3,500/day), attorneys' fees and costs continue to accrue.

See Declaration of Jennifer R. Tullius attached hereto and incorporated by this reference (the "**Tullius Decl.**") at ¶ 2.

Contrary to Debtor's assertion in the Opposition, insurance has **_not_** yet been obtained by the Debtor on the subject properties and it is unknown when (or if) the insurance will be put in place. See Tullius Decl. at Ex. A. Moreover, it appears that the Debtor and its counsel are intentionally misrepresenting the status of the insurance to the Court and the Debtor's creditors as evidenced by the contents of the Opposition and the Declarations of John A. Vos in support thereof (the "**Vos Declarations**"). See Docket Nos. 43, 44, & 46.

As clearly stated in the emails from the insurance agent, insurance can be placed on the properties only once funds are wired to the insurance agent in the total amount of $218,684.23. See Tullius Decl. at Ex. A. Despite numerous requests for confirmation that payment has been made by the Debtor and/or the Debtor's principal, David Schactschneider ("**Schachtschneider**"), at the time of filing of this Joinder, no response has been received from Mr. Vos. See Tullius Decl. at Ex. B.

Similar to concerns raised by the UST's office in the Motion, the lack of communications by the Debtor and its counsel has also been an ongoing issue in this case for Lender. Shortly following the Petition Date, on September 15, 2022, Lender's counsel emailed Debtor's counsel to inquire, *inter alia*, about the status of the insurance on the Debtor's properties. See Tullius

1   Decl. at Ex. B.  Lender's counsel followed up again with Debtor's counsel on several occasions

2   but never received any substantive response.  See Tullius Decl. at Ex. B.

3       Due to the importance and urgency of the situation, both Lender and Lender's counsel

4   have also communicated directly with the Debtor's insurance agent in an effort to: 1) determine

5   the status of the insurance and what was needed to reinstate the lapsed policies; and 2) to

6   determine if Lender might be able to advance the funds necessary to reinstate the insurance

7   policies. See Tullius Decl. at ¶ 5, Ex. A.  According to the insurance agent, the Debtor and/or its

8   agents have repeatedly promised payment over the past several months but have never followed

9   through with sending funds to reinstate the insurance policies.  See Tullius Decl. at ¶ 6, Ex. A.

10      Following receipt of service of the Opposition and the initial Vos Declaration, both of

11  which assert that insurance is in place on the Debtor's properties, Lender and its counsel reached

12  out to the insurance agent to confirm whether or not insurance has, in fact, been paid for on the

13  Debtor's properties. See Tullius Decl. at Ex. B.  In direct contradiction to the statements made by

14  the Debtor and Debtor's counsel, the insurance agent indicated that insurance is not yet in place

15  and that no payment has been received. See Tullius Decl. at Ex. A.  In an effort to give the

16  Debtor and its counsel an opportunity to clarify the misleading and incorrect statements made in

17  the Opposition documents, Lender's counsel then sent Mr. Vos an email informing him of the

18  facts and demanding that he immediately file a clarification with the Court.  See Tullius Decl. at

19  ¶ 7, Ex. B.

20      However, instead of correcting the misstatements in the Opposition and initial Vos

21  Declaration, Mr. Vos filed a second Declaration in which he doubles down on the

22  misinformation and fails to provide any admissible evidence to indicate that insurance is actually

23  paid for and in place.[1]

24      Moreover, it is obvious that the Debtor has no ability to pay for the cost of the property

25  insurance and there are no motions pending to authorize the payment of the insurance premium

26  by Schachtschneider, individually, either as a loan to the Debtor or as a capital contribution.

27

28     [1]   It is notable that neither Mr. Schachtschneider nor anyone with direct evidence has submitted a first-hand sworn declaration on behalf of the Debtor regarding these issues.

1    Some of the facts evidencing the Debtor's inability to pay are as follows:

2        • On the Petition Date, the Debtor had less than $800 in cash on hand. See Docket No.

3            23, p. 1.

4        • Schactschneider testified at the initial 341 Meeting that the Debtor has no operating

5            business that generates any income and that there are no receivables or other assets of

6            Debtor that might be used to pay for the insurance.  See Tullius Decl. at ¶ 10.

7        • Schactschneider recently distributed to himself all but $21 of the cash held by the

8            Debtor as of the Petition Date as an "Owner Draw" without any explanation or notice.

9            See Docket No. 42, p. 15. If Schachtschneider, individually, were able to fund the

10           cost of the insurance premium (over $218,000), he presumably wouldn't need to take

11           $720 in cash out of the Debtor's bank account.

12       It is also abundantly clear that neither the Debtor nor its counsel can be relied upon to

13   represent the facts truthfully.  On October 20, 2022, Schactschneider testified at the continued

14   341 meeting of creditors (the "**Continued 341 Meeting**") that the Debtor was unable to

15   immediately place insurance on the properties due to an insurance company inspection

16   requirement that could not be completed for several weeks.[2] See Tullius Decl. at ¶ 11.

17   Schactschneider further testified at the Continued 341 Meeting that, if all other insurer

18   requirements were met, he would be prepared to fund the payment of the insurance premium

19   immediately ("same day").  See Tullius Decl. at ¶ 12.  Following the Continued 341 Meeting on

20   October 20, 2022, Debtor's insurance agent confirmed to Lender that no such inspection

21   requirement exists (or ever existed) and that the insurance could be placed as soon as the

22   premium was paid in full. See Tullius Decl. at Ex. A.  Lender's counsel immediately informed

23   Debtor's counsel of this development and requested confirmation that the Debtor would be

24   paying the premium immediately, as agreed at the Continued 341 Meeting. See Tullius Decl. at

25   Ex. B.  Instead, Debtor's counsel then used the emails of Lender's counsel to misrepresent the

26

27   [2]   It should be noted that the second Vos Declaration appears to admit that Mr. Schachtschneider
         misrepresented the pre-conditions to issuance of insurance on the properties at the 341
28       Meeting.

-4-
PARTIAL JOINDER TO UST'S MOTION TO CONVERT OR DISMISS

status of the insurance to the Court and other creditors. <u>See</u> Docket Nos. 43, 44 & 46.

It has become clear over the short duration of this case that neither Schactschneider nor Debtor's counsel has the ability to manage this case and/or protect the assets of the Debtor for the benefit of the creditors.[3]  The failure to adequately insure the Debtor's properties and the most recent misrepresentations to the Court are just a few of the more pressing of a long list of issues and concerns. Several other glaring examples:

- The Debtor has failed to file amended Schedules, Statement of Financial Affairs, and other documents in this Bankruptcy Case despite Schachtschneider's acknowledgement of the numerous deficiencies and inaccuracies in the documents currently on file with the Court and the promises of Schachtschneider and Mr. Vos to do so during the initial 341 Meeting and Continued 341 Meeting.  <u>See</u> Tullius Decl. at ¶ 13.

- According to the testimony of Schachtschneider at the 341 Meeting and Continued 341 Meeting:

  o The Debtor has apparently employed professionals (brokers, accountants, etc.) on a post-petition basis without disclosure or court approval. <u>See</u> Tullius Decl. at ¶ 14.

  o The Debtor has, post-petition and without approval, entered into seemingly non-contingent purchase agreements related to the Debtor's properties that contain terms and conditions that may give third-parties post-petition claims against the Debtor and/or bankruptcy estate.  <u>See, e.g.,</u> Docket No. 45.

  o Schachtschneider and the Debtor have commingled funds, shared bank accounts, and otherwise failed to observe corporate formalities.  <u>See</u> Tullius Decl. at ¶ 14.

  o The Debtor has scheduled significant personal debts of Schachtschneider as

---

[3]  The UST has recently filed an objection to the employment of Mr. Vos. <u>See</u> Docket No. 38. For the reasons stated in the UST's objection to Mr. Vos' employment and the reasons stated herein, Lender also joins in the objection to the employment of Mr. Vos as Debtor's counsel.

PARTIAL JOINDER TO UST'S MOTION TO CONVERT OR DISMISS

1    debts of the Debtor.  See Tullius Decl. at ¶ 14.

2    • At the initial 341 Meeting, Schachtschneider testified that a company named Gaian

3        Consulting was owned and operated exclusively by his wife and that it had nothing to

4        do with the Debtor.  See Tullius Decl. at ¶ 15.  However, some of the payments

5        received from the Lender on its loans to the Debtor originated from a Gaian

6        Consulting bank account.  See Tullius Decl. at Ex. C.

7    • The pending sale transaction documents filed by the Debtor include documents

8        apparently giving Schachtschneider and his family the right to continue to occupy

9        both properties following the sale without any rent being paid to the buyer. See, e.g.,

10        Docket No. 45.

11    • The alleged "buyer" of the properties is a defendant in multiple pending lawsuits

12        alleging fraud and other causes of action, at least one of which also raises shocking

13        allegations against the Debtor and Schachtschneider.  See Tullius Decl. at Ex. D.

14        Lender's counsel has made the Debtor and Mr. Vos aware of these lawsuits and the

15        underlying allegations and requested a response regarding how the Debtor believes

16        that it can proceed with this intended buyer.  See Tullius Decl. at ¶ 17, Ex. B.  To

17        date, no response or clarification has been provided. See Tullius Decl. at ¶ 17.

18    While Lender shares the serious concerns articulated by the UST in the Motion and

19    agrees that Schactschneider should not remain in control of the Debtor, Lender is concerned that

20    conversion of the case to Chapter 7 may not satisfactorily address the lack of insurance on the

21    properties due to the fact that there is currently no cash available to either the Debtor or a

22    Chapter 7 trustee to pay the outstanding insurance premium of over $218,000.

23        Lender continues to review and research its options with respect to the insurance issue.

24    Lender may ultimately elect to force-place insurance on the properties (or advance the funds

25    necessary to pay the premiums due on Debtor's policies) as authorized under Lender's loan

26    documents.  However, Lender's decision to pay for the cost of insurance does not obviate the

27    need to immediately remove these assets from the management and control of the Debtor and

28    Schachtschneider.  While Lender's preference would be for the immediate dismissal of the

1   bankruptcy case to allow Lender to proceed with enforcement of its state law remedies (i.e.

2   foreclosure on the properties), Lender understands that appointment of a trustee may better serve

3   the interests of the other creditors in this case.  In the event that the Court is inclined to convert

4   the case to Chapter 7, Lender will attempt to work with the Chapter 7 trustee to the extent

5   possible to get the properties immediately insured.

6

7   Dated:  October 24, 2022                               **TULLIUS LAW GROUP**
                                                           **a Professional Corporation**
8

9                                                          By:  */s/ Jennifer R. Tullius*
                                                           JENNIFER R. TULLIUS
10                                                         Attorneys for Secured Lender:
                                                           PMF CA REIT, L.L.C.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARTIAL JOINDER TO UST'S MOTION TO CONVERT OR DISMISS

# DECLARATION OF JENNIFER R. TULLIUS

I, Jennifer R. Tullius, declare as follows:

1.     I am an attorney at law duly admitted to practice in all Courts of the State of California, as well as in the United States District Court, Northern District of California and the United States Bankruptcy Court, Northern District of California. I am a shareholder of Tullius Law Group, counsel for secured creditor PMF CA REIT, L.L.C. ("**Lender**"). The facts set forth in this declaration are true of my personal knowledge, and if called herein as a witness, I could and would testify competently thereto under oath. I make this Declaration in support of the Lender's partial joinder (the "**Joinder**") in support of the United States Trustee's Motion Pursuant to 11 U.S.C. § 1112(b) and Federal Rules of Bankruptcy Procedure 1017(f) and 9014, to Dismiss or Convert Chapter 11 Case (the "**Motion**") and in response to Impact Energy Partners LLC's ("**Debtor**") opposition thereto (the "**Opposition**").

2.     Lender holds the senior security interests on both of the Debtor's real properties. Lender's secured claims as of the Petition Date are as follows:

- 275 Long Ranch – amount due in excess of $14,300,000 as of the Petition Date. To the extent that Lender is over-secured, default interest (~$7,000/day), attorneys' fees and costs continue to accrue.

- 432 Lovell – amount due in excess of $7,290,000 as of the Petition Date. To the extent that Lender is over-secured, default interest (~$3,500/day), attorneys' fees and costs continue to accrue.

3.     Attached hereto as <u>Exhibit "A"</u> and incorporated by this reference are true and correct copies of emails between me and Debtor's insurance agent.

4.     Attached hereto as <u>Exhibit "B"</u> and incorporated by this reference are true and correct copies of emails between me and Debtor's counsel.

5.     Due to the importance and urgency of the situation, both Lender and I have also communicated directly with the Debtor's insurance agent in an effort to: 1) determine the status of the insurance and what was needed to reinstate the lapsed policies; and 2) to determine if

PARTIAL JOINDER TO UST'S MOTION TO CONVERT OR DISMISS

1   Lender might be able to advance the funds necessary to reinstate the insurance policies. <u>See</u> Ex.

2   A.

3       6.      According to the insurance agent, the Debtor and/or its agents have repeatedly

4   promised payment over the past several months but have never followed through with sending

5   funds to reinstate the insurance policies.

6       7.      Following receipt of service of the Opposition and the initial Vos Declaration,

7   both of which assert that insurance is in place on the Debtor's properties, Lender and I reached

8   out to the insurance agent to confirm whether or not insurance has, in fact, been paid for on the

9   Debtor's properties. <u>See</u> Ex. A.

10      8.      In an effort to give the Debtor and its counsel an opportunity to clarify the

11  misleading and incorrect statements made in the Opposition documents, I sent Mr. Vos an email

12  informing him of the facts and demanding that he immediately file a clarification with the Court.

13  <u>See</u> Ex. B.

14      9.      I personally participated in the 341 Meeting of creditors initially held on October

15  11, 2022 (the "**341 Meeting**"), and continued on October 20, 2022 (the "**Continued 341**

16  **Meeting**").

17      10.     David Schactschneider ("**Schactschneider**") testified at the initial 341 Meeting

18  that the Debtor has no operating business that generates any income and that there are no

19  receivables or other assets of Debtor that might be used to pay for the insurance.

20      11.     Schactschneider testified at the Continued 341 Meeting that the Debtor was

21  unable to immediately place insurance on the properties due to an insurance company inspection

22  requirement that could not be completed for several weeks.

23      12.     Schactschneider further testified at the Continued 341 Meeting that, if all other

24  insurer requirements were met, he would be prepared to fund the payment of the insurance

25  premium immediately ("same day").

26      13.     The Debtor has failed to file amended Schedules, Statement of Financial Affairs,

27  and other documents in this Bankruptcy Case despite Schachtschneider's acknowledgement of

28  the numerous deficiencies and inaccuracies in the documents currently on file with the Court and

PARTIAL JOINDER TO UST'S MOTION TO CONVERT OR DISMISS

the promises of Schachtschneider and Mr. Vos to do so during the initial 341 Meeting and Continued 341 Meeting.

14.     According to the testimony of Schachtschneider at the 341 Meeting and Continued 341 Meeting:

- o  The Debtor has apparently employed professionals (brokers, accountants, etc.) on a post-petition basis without disclosure or court approval.
- o  The Debtor has, post-petition, entered into purchase agreements related to the Debtor's properties.
- o  Schachtschneider and the Debtor have commingled funds, shared bank accounts, and otherwise failed to observe corporate formalities.
- o  The Debtor has scheduled significant personal debts of Schachtschneider as debts of the Debtor.

15.     At the initial 341 Meeting, Schachtschneider testified that a company named Gaian Consulting was owned and operated exclusively by his wife and that it had nothing to do with the Debtor.  However, some of the payments received from the Lender on its loans to the Debtor originated from a Gaian Consulting bank account.  See Exhibit "C" attached hereto and incorporated herein by this reference.

16.     Attached hereto as Exhibit "D" and incorporated by this reference is a true and correct copy of a Complaint that I obtained from plaintiff's counsel in the action filed against the alleged "buyer" of the properties, the Debtor and Schachtschneider.

17.     I made Mr. Vos aware of these lawsuits and the underlying allegations and requested a response regarding how the Debtor believes that it can proceed with this intended buyer.  See Ex. B.  To date, no response or clarification has been provided.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24th day of October, 2022, at Los Angeles, California.


                                                   /s/ Jennifer R. Tullius
                                        _____
                                        JENNIFER R. TULLIUS

# Exhibit "A"

**Jennifer Tullius**

| | |
|---|---|
| **From:** | Carri Mangelli <carri.mangelli@usi.com> |
| **Sent:** | Monday, October 24, 2022 12:31 PM |
| **To:** | Jennifer Tullius |
| **Cc:** | Ed Fischer; Kimberly Scherer |
| **Subject:** | RE: [EXTERNAL] Fwd: Schachtschneider Invoices Urgent |

Hello Jennifer,

I texted Joseph and no response yet. I said "Hi Joe, it's almost 1pm, making sure you got the wire in". No response yet.

The best way to do this would be to get a bank routing number and account number as an FYI. That way it's paid asap. Just an option if you end up paying this for them.

I'll keep you posted.

Carri

CARRI MANGELLI
Vice President, Private Risk Manager
Family Office
USI Insurance Services
201 Mission St, 11th Floor, San Francisco, CA 94105
CA License No. 0G11911
Direct: 628-201-9069 | Cell: 415-793-0936 | Fax: 610-537-4281
carri.mangelli@usi.com | www.usi.com





THE USI ONE ADVANTAGE®
   Our Approach to Delivering Client Solutions ► Watch Video

*Please note that you may not rely on email communication to us to report a claim or to give us instructions to place, bind, change or terminate coverage unless we have subsequently confirmed to you in writing that we have received your message and will be taking the action you have requested.*

*Confidentiality Notice: The information contained in this email message including any attachments is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply email and destroy all **copies of the original message. Thank You.***

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error,

you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

**From:** Jennifer Tullius <jtullius@tulliuslaw.com>
**Sent:** Monday, October 24, 2022 12:24 PM
**To:** Carri Mangelli <carri.mangelli@usi.com>
**Cc:** Ed Fischer <efischer@pmfundllc.com>
**Subject:** RE: [EXTERNAL] Fwd: Schachtschneider Invoices Urgent

To clarify, it has not yet been paid, correct?

**Jennifer R. Tullius**
**TULLIUS LAW GROUP**
515 S. Flower St., 18th Floor
Los Angeles, CA  90071
Main: 213-291-9481
Direct: 213-787-5958
Fax: 213-674-4364
jtullius@tulliuslaw.com

**From:** Carri Mangelli <carri.mangelli@usi.com>
**Sent:** Monday, October 24, 2022 12:23 PM
**To:** Jennifer Tullius <jtullius@tulliuslaw.com>
**Cc:** Ed Fischer <efischer@pmfundllc.com>
**Subject:** Re: [EXTERNAL] Fwd: Schachtschneider Invoices Urgent

Insurance will be obtained once it's paid. I'll see what they say about payment.

CARRI MANGELLI
Vice President, Private Risk Manager
Family Office
USI Insurance Services
201 Mission St, 11th Floor, San Francisco, CA 94105
CA License No. 0B39752
Direct: 628-201-9069 | Cell: 415-793-0936 | Fax: 610-537-4281
carri.mangelli@usi.com | www.usi.com

**From:** Jennifer Tullius <jtullius@tulliuslaw.com>
**Sent:** Monday, October 24, 2022 12:20:52 PM
**To:** Carri Mangelli <carri.mangelli@usi.com>
**Cc:** Ed Fischer <efischer@pmfundllc.com>
**Subject:** RE: [EXTERNAL] Fwd: Schachtschneider Invoices Urgent

Hi Carri,

Mr. Schachtschneider's attorney just filed a document (attached) representing to the Court that insurance has been obtained.  Can you please confirm ASAP whether this is accurate and, if not, if you have any communications from Mr. Ley or Mr. Schachtschneider as to when payment will be made?  Thanks!

Jennifer

**From:** Carri Mangelli <carri.mangelli@usi.com>
**Sent:** Monday, October 24, 2022 10:24 AM
**To:** Ed Fischer <efischer@pmfundllc.com>
**Subject:** [EXTERNAL] Fwd: Schachtschneider Invoices Urgent

FYI

CARRI MANGELLI
Vice President, Private Risk Manager
Family Office
USI Insurance Services
201 Mission St, 11th Floor, San Francisco, CA 94105
CA License No. 0B39752
Direct: 628-201-9069 | Cell: 415-793-0936 | Fax: 610-537-4281
carri.mangelli@usi.com | www.usi.com

---

**From:** Kimberly Scherer <kimberly.scherer@usi.com>
**Sent:** Monday, October 24, 2022 10:17:57 AM
**To:** David Gaian <david@impactenergy.global>
**Cc:** Kimberly Scherer <kimberly.scherer@usi.com>; Carri Mangelli <carri.mangelli@usi.com>;
joseph@impactenergy.global <joseph@impactenergy.global>
**Subject:** Schachtschneider Invoices Urgent

Hello David,

Hope you are doing well. Please see the attached invoices for Long Ranch Rd and Lovell Rd.

**The amount due for Lovell Avenue is $55,593.78**
**The amount due for Long Ranch Rd is $163,090.45**

**To Pay by check: Please use the attached FedEx Label**
Please make check payable to: USI Insurance Services, LLC

**You can also pay electronically:**

**Electronic Payment form:** I just need you to fill in your banking information and sign the attached form.
You can email or fax me at 610-537-4281.

**Pay USI online at: usi.epaypolicy.com Your Client Code is SCHACDAV, use zip code 94941**
**ACH from your bank account is free,** credit cards charge a 3.25% fee

Just let me know if you have any questions.

Thank you for choosing USI Insurance Services, we appreciate your business,

KIMBERLY SCHERER
Account Representative, Private Risk Management
USI Insurance Services
(FKA Wells Fargo Insurance Services)
201 Mission St, 11th Floor, San Francisco, CA 94105
CA License No. 0C68575

Direct: 628-201-9068
Fax: 610-537-4281
[Kimberly.scherer@usi.com](mailto:Kimberly.scherer@usi.com) | [www.usi.com](http://www.usi.com)



THE USI ONE ADVANTAGE®
    Our Approach to Delivering Client Solutions ► Watch Video

*Please note that you may not rely on email communication to us to report a claim or to give us instructions to place, bind, change or terminate coverage unless we have subsequently confirmed to you in writing that we have received your message and will be taking the action you have requested.*

*Confidentiality Notice: The information contained in this email message including any attachments is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. Thank You.*

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited. This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited. This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

**Jennifer Tullius**

| | |
|---|---|
| **From:** | Carri Mangelli <carri.mangelli@usi.com> |
| **Sent:** | Friday, October 21, 2022 3:26 PM |
| **To:** | Ed Fischer |
| **Cc:** | Jennifer Tullius |
| **Subject:** | RE: [EXTERNAL] FW: Schachtschneider - Mill Valley and Long Ranch - SIGNATURE NEEDED |

Hello Ed,

Yes, he signed the "no known loss letter" and we submitted the letter to AIG.  They will now release the policy along with an invoice which will need to be paid upon receipt.

I did call David after he signed and I asked if he is prepared to pay the invoice as I've stuck my neck out here and he said "that's the intent".   I said when can it be paid and he said "next week once the funds are there"…. Or something along those lines.

I'll be sending the invoice to him once received.  I'll also send it to you under separate cover.

Best,
Carri

CARRI MANGELLI
Vice President, Private Risk Manager
Family Office
USI Insurance Services
201 Mission St, 11th Floor, San Francisco, CA 94105
CA License No. 0G11911
Direct: 628-201-9069 | Cell:  415-793-0936 | Fax: 610-537-4281
carri.mangelli@usi.com | www.usi.com





THE USI ONE ADVANTAGE®
    Our Approach to Delivering Client Solutions ► Watch Video

*Please note that you may not rely on email communication to us to report a claim or to give us instructions to place, bind, change or terminate coverage unless we have subsequently confirmed to you in writing that we have received your message and will be taking the action you have requested.*

*Confidentiality Notice: The information contained in this email message including any attachments is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply email and destroy all **copies of the original message. Thank You.***

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

**From:** Ed Fischer <efischer@pmfundllc.com>
**Sent:** Friday, October 21, 2022 3:08 PM
**To:** Carri Mangelli <carri.mangelli@usi.com>
**Cc:** Jennifer Tullius <jtullius@tulliuslaw.com>
**Subject:** RE: [EXTERNAL] FW: Schachtschneider - Mill Valley and Long Ranch - SIGNATURE NEEDED

Is he signing?

Ed Fischer
Private Mortgage Fund, LLC
23586 Calabasas Rd. # 100
Calabasas, CA 91302
(818) 702-2554 (Direct)
(818) 222-1893 (fax)
(818) 674-1551 (mobile)
CFL License # 603 H236

PRIVILEGED AND CONFIDENTIAL: All information transmitted hereby is intended
only for the use of the addressee(s) named above.  If the reader of this
message is not the intended recipient or the employee or agent responsible
for delivering the message to the intended recipient(s), please note that
any distribution or copying of this communication is strictly prohibited.
Anyone who receives this communication in error should notify us immediately
by reply email and delete the original message.

**From:** Carri Mangelli <carri.mangelli@usi.com>
**Sent:** Friday, October 21, 2022 3:05 PM
**To:** Ed Fischer <efischer@pmfundllc.com>
**Cc:** Jennifer Tullius <jtullius@tulliuslaw.com>
**Subject:** Re: [EXTERNAL] FW: Schachtschneider - Mill Valley and Long Ranch - SIGNATURE NEEDED

Just spoke to him.

CARRI MANGELLI
Vice President, Private Risk Manager
Family Office
USI Insurance Services
201 Mission St, 11th Floor, San Francisco, CA 94105
CA License No. 0B39752
Direct: 628-201-9069 | Cell: 415-793-0936 | Fax: 610-537-4281
carri.mangelli@usi.com | www.usi.com

**From:** Ed Fischer <efischer@pmfundllc.com>
**Sent:** Friday, October 21, 2022 3:01:49 PM
**To:** Carri Mangelli <carri.mangelli@usi.com>

**Cc:** Jennifer Tullius <<jtullius@tulliuslaw.com>>
**Subject:** RE: [EXTERNAL] FW: Schachtschneider - Mill Valley and Long Ranch - SIGNATURE NEEDED

Carri - Did you get any response from David regarding this?

Ed Fischer
Private Mortgage Fund, LLC
23586 Calabasas Rd. # 100
Calabasas, CA 91302
(818) 702-2554 (Direct)
(818) 222-1893 (fax)
(818) 674-1551 (mobile)
CFL License # 603 H236

PRIVILEGED AND CONFIDENTIAL: All information transmitted hereby is intended
only for the use of the addressee(s) named above.   If the reader of this
message is not the intended recipient or the employee or agent responsible
for delivering the message to the intended recipient(s), please note that
any distribution or copying of this communication is strictly prohibited.
Anyone who receives this communication in error should notify us immediately
by reply email and delete the original message.

**From:** Carri Mangelli <<carri.mangelli@usi.com>>
**Sent:** Friday, October 21, 2022 1:34 PM
**To:** Ed Fischer <<efischer@pmfundllc.com>>
**Subject:** [EXTERNAL] FW: Schachtschneider - Mill Valley and Long Ranch - SIGNATURE NEEDED


FYI- below and attached.

CARRI MANGELLI
Vice President, Private Risk Manager
Family Office
USI Insurance Services
201 Mission St, 11th Floor, San Francisco, CA 94105
CA License No. 0G11911
Direct: 628-201-9069 | Cell:  415-793-0936 | Fax: 610-537-4281
carri.mangelli@usi.com | www.usi.com





THE USI ONE ADVANTAGE®
   Our Approach to Delivering Client Solutions ► Watch Video

*Please note that you may not rely on email communication to us to report a claim or to give us instructions to place, bind, change or terminate coverage unless we have subsequently confirmed to you in writing that we have received your message and will be taking the action you have requested.*

*Confidentiality Notice: The information contained in this email message including any attachments is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply email and destroy all **copies of the original message. Thank You.***

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

**From:** Carri Mangelli
**Sent:** Friday, October 21, 2022 1:30 PM
**To:** Joe Ley <joe@impactenergy.global>; David Gaian <david@impactenergy.global>
**Cc:** Mary Engel <Mary.Engel@usi.com>
**Subject:** Schachtschneider - Mill Valley and Long Ranch - SIGNATURE NEEDED

Hello David,

I got approval to reinstate both Mill Valley and Long Ranch but I need the attached no known loss letter signed. An invoice will follow upon receipt of this signed document.  Thank you for your patience.  This wasn't easy to get done but we persevered.

Best,
Carri

CARRI MANGELLI
Vice President, Private Risk Manager
Family Office
USI Insurance Services
201 Mission St, 11th Floor, San Francisco, CA 94105
CA License No. 0G11911
Direct: 628-201-9069 | Cell:  415-793-0936 | Fax: 610-537-4281
carri.mangelli@usi.com | www.usi.com





THE USI ONE ADVANTAGE®
   Our Approach to Delivering Client Solutions ► Watch Video

*Please note that you may not rely on email communication to us to report a claim or to give us instructions to place, bind, change or terminate coverage unless we have subsequently confirmed to you in writing that we have received your message and will be taking the action you have requested.*

*Confidentiality Notice: The information contained in this email message including any attachments is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply email and destroy all **copies of the original message. Thank You.***

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

# Exhibit "B"

**Jennifer Tullius**

| | |
|---|---|
| **From:** | Jennifer Tullius |
| **Sent:** | Monday, October 24, 2022 4:31 PM |
| **To:** | 'Vos Law Office' |
| **Cc:** | 'Rofael, Elvina (USTP)' |
| **Subject:** | RE: [EXTERNAL] FW: FW: Schachtschneider Invoices Urgent |

Mr. Vos,

While I appreciate that the Debtor (through you) is now admitting that Mr. Schachtschneider misrepresented the pre-conditions to insurance coverage at the 341 meeting, your new Declaration is equally problematic as it continues to represent to the Court and creditors that insurance is in place as of 10/23/22, which is not at all accurate.  As all of the emails you have been forwarded (and that the Debtor has received directly from the insurance agent) make clear, the insurance **must be paid for** before it is effective.  Neither the Debtor nor Mr. Schachtschneider has presented any evidence that the insurance has been paid for and, in fact, the insurance agent just recently confirmed to me that it has not been paid for.

Again, my client demands that you immediately clarify with the Court the fact that there is **no insurance currently in place** and that insurance is dependent on payment by the Debtor, which has not happened and which, to my understanding, cannot happen due to lack of funds.  Please also be advised that, to the extent that your misrepresentations to the Court are the result of you conveying misinformation being supplied by others, you may wish to better inform yourself about the veracity of your statements before submitting sworn declarations to the Court.  The fact that Mr. Schachtschneider has not submitted first-hand sworn declarations regarding these issues is extremely telling.

Thank you,

Jennifer

**Jennifer R. Tullius**
**TULLIUS LAW GROUP**
515 S. Flower St., 18th Floor
Los Angeles, CA  90071
Main: 213-291-9481
Direct: 213-787-5958
Fax: 213-674-4364
jtullius@tulliuslaw.com

**From:** Jennifer Tullius
**Sent:** Monday, October 24, 2022 12:04 PM
**To:** Vos Law Office <voslaw@aol.com>
**Cc:** Rofael, Elvina (USTP) <Elvina.Rofael@usdoj.gov>
**Subject:** RE: [EXTERNAL] FW: FW: Schachtschneider Invoices Urgent
**Importance:** High

Mr. Vos,

The Declaration that you just filed is a complete misrepresentation of my email to you and I demand that you immediately file a clarification with the Court.  At no point did I advise you that insurance is in place.  I advised you that insurance would be in place **as soon as the Debtor pays for it** and I have seen no evidence of payment.

Again, please immediately clarify your court filings. Otherwise, I will be forced to inform the court that your misrepresentations must be intentional and request consideration of sanctions against both you and the Debtor.

Jennifer

**Jennifer R. Tullius**
**TULLIUS LAW GROUP**
515 S. Flower St., 18th Floor
Los Angeles, CA 90071
Main: 213-291-9481
Direct: 213-787-5958
Fax: 213-674-4364
jtullius@tulliuslaw.com

**From:** Jennifer Tullius
**Sent:** Monday, October 24, 2022 10:55 AM
**To:** Vos Law Office <voslaw@aol.com>
**Cc:** Rofael, Elvina (USTP) <Elvina.Rofael@usdoj.gov>
**Subject:** FW: [EXTERNAL] FW: FW: Schachtschneider Invoices Urgent
**Importance:** High

Mr. Vos,

The insurance agent sent the attached invoices to Mr. Schachtschneider for payment and Mr. Ley has confirmed receipt. As Mr. Schachtschneider agreed to pay these as soon as they were received, we trust that Mr. Schachtschneider will be wiring the funds necessary to reinstate the policies this morning. Please provide evidence of payment and confirmation from the insurer that the insurance has been bound ASAP.

Please also confirm in what capacity Mr. Schachtschneider is making these payments and where the funds are coming from.

Thank you.

Jennifer

**Jennifer R. Tullius**
**TULLIUS LAW GROUP**
515 S. Flower St., 18th Floor
Los Angeles, CA 90071
Main: 213-291-9481
Direct: 213-787-5958
Fax: 213-674-4364
jtullius@tulliuslaw.com

**From:** Ed Fischer <efischer@pmfundllc.com>
**Sent:** Monday, October 24, 2022 10:37 AM
**To:** Jennifer Tullius <jtullius@tulliuslaw.com>
**Subject:** FW: [EXTERNAL] FW: FW: Schachtschneider Invoices Urgent

Ed Fischer
Private Mortgage Fund, LLC

23586 Calabasas Rd. # 100
Calabasas, CA 91302
(818) 702-2554 (Direct)
(818) 222-1893 (fax)
(818) 674-1551 (mobile)
CFL License # 603 H236

PRIVILEGED AND CONFIDENTIAL: All information transmitted hereby is intended
only for the use of the addressee(s) named above.   If the reader of this
message is not the intended recipient or the employee or agent responsible
for delivering the message to the intended recipient(s), please note that
any distribution or copying of this communication is strictly prohibited.
Anyone who receives this communication in error should notify us immediately
by reply email and delete the original message.

**From:** Carri Mangelli <carri.mangelli@usi.com>
**Sent:** Monday, October 24, 2022 10:34 AM
**To:** Ed Fischer <efischer@pmfundllc.com>
**Subject:** [EXTERNAL] FW: FW: Schachtschneider Invoices Urgent

FYI


CARRI MANGELLI
Vice President, Private Risk Manager
Family Office
USI Insurance Services
201 Mission St, 11th Floor, San Francisco, CA 94105
CA License No. 0G11911
Direct: 628-201-9069 | Cell:  415-793-0936 | Fax: 610-537-4281
carri.mangelli@usi.com | www.usi.com





THE USI ONE ADVANTAGE®
   Our Approach to Delivering Client Solutions ► Watch Video

*Please note that you may not rely on email communication to us to report a claim or to give us instructions to place, bind, change or terminate coverage unless we have subsequently confirmed to you in writing that we have received your message and will be taking the action you have requested.*

*Confidentiality Notice: The information contained in this email message including any attachments is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply email and destroy all **copies of the original message. Thank You.**

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended
solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have

received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

**From:** Joe Ley <joe@impactenergy.global>
**Sent:** Monday, October 24, 2022 10:32 AM
**To:** Kimberly Scherer <kimberly.scherer@usi.com>
**Cc:** David Gaian <david@impactenergy.global>; Carri Mangelli <carri.mangelli@usi.com>
**Subject:** Re: FW: Schachtschneider Invoices Urgent

Hi Kim,

Great! Thanks for the wiring info and the note.

Thanks,

Joe

On Mon, Oct 24, 2022 at 10:31 AM Kimberly Scherer <kimberly.scherer@usi.com> wrote:

Hello Joe,

I also just added the wire details in case the bank needs it.

Best,

KIMBERLY SCHERER

Account Representative, Private Risk Management

USI Insurance Services

(FKA Wells Fargo Insurance Services)

201 Mission St, 11th Floor, San Francisco, CA 94105

CA License No. 0C68575

Direct: 628-201-9068

Fax: 610-537-4281

Kimberly.scherer@usi.com | www.usi.com



THE USI ONE ADVANTAGE®

Our Approach to Delivering Client Solutions ► Watch Video

*Please note that you may not rely on email communication to us to report a claim or to give us instructions to place, bind, change or terminate coverage unless we have subsequently confirmed to you in writing that we have received your message and will be taking the action you have requested.*

*Confidentiality Notice: The information contained in this email message including any attachments is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. Thank You.*

**From:** Kimberly Scherer
**Sent:** Monday, October 24, 2022 10:26 AM
**To:** David Gaian <david@impactenergy.global>
**Cc:** Kimberly Scherer <kimberly.scherer@usi.com>; Carri Mangelli <carri.mangelli@usi.com>; joseph@impactenergy.global
**Subject:** FW: Schachtschneider Invoices Urgent
**Importance:** High

Hello David,

Hope you are doing well. Please see the attached invoices for Long Ranch Rd and Lovell Rd. Once the policies are paid in full to the carrier, coverage will be reinstated.

**The amount due for Lovell Avenue is $55,593.78**

**The amount due for Long Ranch Rd is $163,090.45**

**To Pay by check: Please use the attached FedEx Label**

Please make check payable to: USI Insurance Services, LLC

**You can also pay electronically:**

**Electronic Payment form:** I just need you to fill in your banking information and sign the attached form. You can email or fax me at 610-537-4281.

**Pay USI online at: usi.epaypolicy.com Your Client Code is SCHACDAV, use zip code 94941**

**ACH from your bank account is free, credit cards charge a 3.25% fee**

Just let me know if you have any questions.

Thank you for choosing USI Insurance Services, we appreciate your business,

KIMBERLY SCHERER

Account Representative, Private Risk Management

USI Insurance Services

(FKA Wells Fargo Insurance Services)

201 Mission St, 11th Floor, San Francisco, CA 94105

CA License No. 0C68575

Direct: 628-201-9068

Fax: 610-537-4281

Kimberly.scherer@usi.com | www.usi.com



Case: 22-30476    Doc# 47    Filed: 10/24/22    Entered: 10/24/22 18:26:44    Page 27 of 81

THE USI ONE ADVANTAGE®

Our Approach to Delivering Client Solutions ► Watch Video

*Please note that you may not rely on email communication to us to report a claim or to give us instructions to place, bind, change or terminate coverage unless we have subsequently confirmed to you in writing that we have received your message and will be taking the action you have requested.*

*Confidentiality Notice: The information contained in this email message including any attachments is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. Thank You.*

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

**Jennifer Tullius**

| | |
|---|---|
| **From:** | Jennifer Tullius |
| **Sent:** | Friday, October 21, 2022 10:14 AM |
| **To:** | Vos Law Office |
| **Cc:** | Rofael, Elvina (USTP) |
| **Subject:** | RE: In re Impact Energy Partners - CANB Case No. 22-30476 |
| **Attachments:** | 22-0913 Amended Grafstein Complaint .pdf |

Mr. Vos,

In follow up to the emails below, attached is another Complaint that I just received a copy of that you probably should be aware of it you are not already (it is mentioned in the SOFA). The allegations in this are consistent with what I have heard from multiple attorneys whose clients have had dealings with the Debtor/Mr. Schechtschneider.

I also have not received the documents (PSA documents and property appraisals) that Mr. Schectschneider promised to email me yesterday.  Can you please forward those ASAP?  Thank you.

Jennifer

**Jennifer R. Tullius**
**TULLIUS LAW GROUP**
515 S. Flower St., 18th Floor
Los Angeles, CA  90071
Main: 213-291-9481
Direct: 213-787-5958
Fax: 213-674-4364
jtullius@tulliuslaw.com

**From:** Jennifer Tullius
**Sent:** Thursday, October 20, 2022 4:00 PM
**To:** Vos Law Office <voslaw@aol.com>
**Cc:** Rofael, Elvina (USTP) <Elvina.Rofael@usdoj.gov>
**Subject:** RE: In re Impact Energy Partners - CANB Case No. 22-30476
**Importance:** High

Mr. Vos,

My client just spoke with the insurer and, good news, there is no inspection requirement.  Please ask the Debtor to immediately may the amounts due to reinstate.  Per your client's testimony today, he should be able to do that by tomorrow.  Plese forward evidence ASAP that the insurance policies have been reinstated.

Thank you.

Jennifer

**Jennifer R. Tullius**
**TULLIUS LAW GROUP**
515 S. Flower St., 18th Floor
Los Angeles, CA  90071
Main: 213-291-9481
Direct: 213-787-5958

Fax: 213-674-4364
jtullius@tulliuslaw.com

**From:** Jennifer Tullius
**Sent:** Thursday, October 20, 2022 12:24 PM
**To:** Vos Law Office <voslaw@aol.com>
**Cc:** Rofael, Elvina (USTP) <Elvina.Rofael@usdoj.gov>
**Subject:** RE: In re Impact Energy Partners - CANB Case No. 22-30476

Mr. Vos,

I would be happy to discuss it with you over the phone when you have time to discuss. Attached is a Complaint that is pending against Trafero/Singh that is extremely concerning when compared to facts that the Debtor/Sing have told my client and/or the brokers and the fact that the Debtor's survival appears to depend entirely on a transaction with Trafero/Singh. The objection to your employment filed by the UST's office today mirrors my concerns about your retention as well.

It is my client's understanding that the sole issue on insurance is payment and that it will cost ~$265,000 to reinstate. If you have documents reflecting something different or have spoken with the insurer yourself directly, please forward/advise.

Regarding the incorrect/misrepresented information in the Schedules, that is something that you should be confirming/verifying with your client and/or public records. Attached are payoff demands for both of my client's loans as of the Petition Date if that is helpful with respect to my client's claims.

Can you please forward the appraisals for both properties that the Debtor discussed at the 341 last week? Thank you.

Jennifer

**Jennifer R. Tullius**
**TULLIUS LAW GROUP**
515 S. Flower St., 18th Floor
Los Angeles, CA  90071
Main: 213-291-9481
Direct: 213-787-5958
Fax: 213-674-4364
jtullius@tulliuslaw.com

**From:** Vos Law Office <voslaw@aol.com>
**Sent:** Thursday, October 20, 2022 12:08 PM
**To:** Jennifer Tullius <jtullius@tulliuslaw.com>
**Subject:** Re: In re Impact Energy Partners - CANB Case No. 22-30476

Thank you Ms. Tullius.

As you know, I am out this week.  But I have a concern regarding the information you have obtained with respect that some sort of fraud may be going on.  Please elaborate and share with me more specifically what you have uncovered, with documents if possible. I want no part of any fraud. Again, thank you.

As discussed at the s.341 meeting, it is my understanding that insurance is being sought, but the problem is that the carrier wants to have an inspection and inspectors' appointments are backed up.  This does not solve the issue of lack of insurance, but it mitigates what otherwise might be considered "shining on" the issue.

Generally, I try to avoid getting sucked into eMail back-and-forth. Send to me documents to look at if you would like me better to be informed, ok? Let's chat if you want and when you are available.

- John Vos

-----Original Message-----
From: Jennifer Tullius <jtullius@tulliuslaw.com>
To: Vos Law Office <voslaw@aol.com>
Cc: Elvina.Rofael@usdoj.gov <Elvina.Rofael@usdoj.gov>
Sent: Tue, Oct 18, 2022 11:22 am
Subject: RE: In re Impact Energy Partners - CANB Case No. 22-30476

Mr. Vos,

I am again following up for the requested information below.

Regarding the pending sale, I have now come to understand (given the various litigation currently pending against Trafero and/or Mr. Singh and after speaking with the attorneys involved in those cases) that the likelihood of an Impact Energy sale proceeding with Trafero/Singh is highly unlikely (if not impossible). If you are unaware of the pending fraud allegations, please feel free to give me a call and I can bring you up to speed – some of the claims being made sound shockingly similar to things my client has heard with respect to Impact Energy and its "deal" with Trafero/Singh. You may also want to reconsider accepting payment from Trafero/Singh given the potential conflict of interest and/or potential fraud issues. Please understand that my client reserves all rights to later object to your employment and/or the payment of your fees if it is discovered that your retention and/or the source of your payments was improper.

The Debtor's valuations of the properties are also grossly overstated. It is my client's understanding that, once all liens/taxes are accounted for, there is no equity in either of the properties. If you have appraisals that reflect the Debtor's valuations, please provide. My client will also be proceeding with obtaining appraisal(s) (at the Debtor's cost under the loan documents) to support the relief from stay motion(s) that will be filed imminently if the bankruptcy case is not dismissed sooner.

Further, please note that the information contained in the Debtor's Schedules is materially incorrect with respect to my client's liens. Contrary to the assertions in the Schedules, my client has separate (not cross-collateralized) 1st priority loans against both of the Debtor's properties as follows:

- 275 Long Ranch – amount due in excess of $14,300,000 as of the Petition Date. To the extent that my client is over-secured, default interest (~$7k/day), attorneys fees and costs continue to accrue.
- 432 Lovell – amount due in excess of $7,290,000 as of the Petition Date. To the extent that my client is over-secured, default interest (~$3500/day), attorneys fees and costs continue to accrue.

It also appears that the amounts, priority and/or existence of other loans/liens related to these properties have been materially misrepresented in the Schedules. I would urge you and the Debtor to immediately amend the Schedules to correct these defects.

While I saw that the UST has just filed a Motion to convert this BK to Chapter 7, please understand that given the issues raised in this email and the likelihood that there are no funds available for a Chapter 7 trustee to pay for insurance for the properties (which my client believes would cost in excess of $250,000), my client will be urging the Court instead to dismiss this BK so that my client may proceed with enforcing its foreclosure remedies.

I remain available to discuss at your convenience. Thank you.

Jennifer

**Jennifer R. Tullius**
**TULLIUS LAW GROUP**

515 S. Flower St., 18th Floor
Los Angeles, CA 90071
Main: 213-291-9481
Direct: 213-787-5958
Fax: 213-674-4364
jtullius@tulliuslaw.com

---

**From:** Jennifer Tullius
**Sent:** Monday, October 3, 2022 9:13 AM
**To:** Vos Law Office <voslaw@aol.com>
**Subject:** RE: In re Impact Energy Partners - CANB Case No. 22-30476

Good Morning John,

I did not receive any information or documents from you last week as agreed in the emails below. Can you please let me know when we can expect to receive the requested items/information? Thank you.

Jennifer

**Jennifer R. Tullius**
**TULLIUS LAW GROUP**
515 S. Flower St., 18th Floor
Los Angeles, CA 90071
Main: 213-291-9481
Direct: 213-787-5958
Fax: 213-674-4364
jtullius@tulliuslaw.com

---

**From:** Jennifer Tullius
**Sent:** Thursday, September 22, 2022 10:34 AM
**To:** Vos Law Office <voslaw@aol.com>
**Subject:** RE: In re Impact Energy Partners - CANB Case No. 22-30476

Good Morning John,

I am sorry to hear that Mr. Gaian is still in the hospital. Mr. Ahamari (broker) informed my client on 9/12 that Mr. Gaian was in the hospital with a broken rib from a biking accident. We were surprised to now hear that he is still in the hospital – especially since the Petition was filed during that period (I would have assumed that he was working with you on that). The injuries must have been much more extensive then previously conveyed. This also appears to be at least the 2nd or 3rd biking accident in the past few months resulting in Mr. Gaian's hospitalization. That is incredibly unlucky.

While I appreciate your attempt to provide assurances on the property value, that is not at all my client's understanding and I have seen no evidence to support that. My client remains very concerned about their security position with respect to these properties and will need to take action in the near term if they do not receive adequate assurances/information from the Debtor.

The items/information requested in my email below are not extensive and should be easily obtainable (and already in Debtor's possession). However, I do understand that you may need additional time to work with your client to provide responses given his hospitalization. As such, my client will agree to extend the deadline to respond to **September 30, 2022**.

Thank you.

Jennifer

**Jennifer R. Tullius**
**TULLIUS LAW GROUP**
515 S. Flower St., 18th Floor
Los Angeles, CA 90071
Main: 213-291-9481
Direct: 213-787-5958
Fax: 213-674-4364
jtullius@tulliuslaw.com

**From:** Vos Law Office <voslaw@aol.com>
**Sent:** Wednesday, September 21, 2022 5:12 PM
**To:** Jennifer Tullius <jtullius@tulliuslaw.com>
**Subject:** Re: In re Impact Energy Partners - CANB Case No. 22-30476

Dear Ms. Tullius -

You may have heard, the principal of Impact Energy Partners LLC has been in a significant bicycle accident and is in the hospital at Marin General. As a consequence he and I have not been able to meet to go over the issues you raise in your most recent communication. I hope to be able to meet with him next week.

As I live in Marin I am familair with some local real estate properties, and values. I think your client is not at risk.

Under the circumstances would it be appropriate to defer the deadline you ask for another week to ten days?

- John Vos


-----Original Message-----
From: Jennifer Tullius <jtullius@tulliuslaw.com>
To: voslaw@aol.com <voslaw@aol.com>
Sent: Thu, Sep 15, 2022 12:00 pm
Subject: In re Impact Energy Partners - CANB Case No. 22-30476

Mr. Vos,

I am counsel for PMF CA REIT, L.L.C. ("Lender") in connection with the above-referenced bankruptcy case. Please direct all communications related to this matter and my client to my attention. I look forward to working with you toward a successful resolution for both of our clients.

As you may be aware, Lender is the secured lender on the following two properties owned by Debtor:

- 275 Long Ranch Road, St. Helena, CA
- 432 Lovell Ave., Mill Valley, CA

Lender has been pursuing foreclosure on both properties based upon Debtor's failure to repay amounts owed at maturity on Lender's two loans. While I understand that you may just be getting up to speed on the various issues involving this Debtor and/or the above properties, it is Lender's understanding that Lender may not be adequately protected on one or both properties. In fact, Debtor's list of 20 largest unsecured creditors appears to indicate that Debtor believes that Lender is undersecured by at least $2,000,000. Given the lack of adequate protection and/or the rapid erosion of any equity in the properties that may exist, Lender may need to move quickly to obtain relief from stay in order to complete the pending foreclosures.

Although Debtor may have the properties under contract for sale and hope to pay my client off in the near term, it appears that various roadblocks to consummating the sale(s) continue to arise. As such, Lender' patience to allow additional time to close on any sale is extremely limited given the apparent lack of ability of the buyer to perform and the lack of adequate protection.

Since Debtor apparently needs additional time to close the sale(s) as well as Lender's forbearance from seeking relief from the automatic stay, Lender requests that the Debtor please provide the following information/documents by **no later than September 23, 2022**:

- Copies of any appraisals and/or opinions of value of either property in Debtor's possession or control including but not limited to the basis for Debtor's assertion of $11,000,000 as collateral value in the list of 20 largest unsecured

creditors. Please note that, to the extent that Lender deems it appropriate, Lender may also order its own appraisal of the properties. This would be a Debtor cost under the loan documents.

- Evidence that the properties are properly insured and that Lender is covered by such insurance (i.e. copies of all lender related endorsements) as required by the loan documents.
- Information and supporting documents to confirm the current status of any pending sale(s) and the projected closing timing (including your projected timeline for a hearing on any sale motion(s) in the BK Case).
- Explanation of how Debtor proposes to adequately protect Lender during the pendency of this case.

Finally, please understand that, to the extent that Lender is actually over-secured, the Debtor will be responsible for all post-petition interest, attorney's fees and costs incurred. Accordingly, it would be in everyone's best interests if Debtor and Lender work together to avoid the escalation of fees/costs in this case.

Please let me know if you have any questions. I would also be happy to jump on a call to discuss if that would be helpful. Thank you.

Jennifer

**Jennifer R. Tullius**
**TULLIUS LAW GROUP**
515 S. Flower St., 18th Floor
Los Angeles, CA 90071
Main: 213-291-9481
Direct: 213-787-5958
Fax: 213-674-4364
jtullius@tulliuslaw.com

IRS Circular 230 Notice: To ensure compliance with requirements imposed by the IRS, which became applicable to all tax practitioners as of June 20, 2005, please be advised that any U.S. federal tax advice contained in this communication, including any attachment(s), is not intended or written to be used or relied on, and cannot be used or relied on by any taxpayer, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.
Confidentiality Notice: The information contained in this email and any attachment(s) to it is intended only for the use of the intended recipient and may be confidential and/or privileged. If any recipient of this communication is not the intended recipient; unauthorized use, disclosure or copying of this email and any accompanying attachment(s) or other information contained herein is strictly prohibited, and may be unlawful. If you have received this communication in error, please immediately notify the sender by return email, and destroy the email, and any and all copies thereof, including any attachment(s), without reading them or saving them in any manner. Thank you.

# Exhibit "C"



Welcome **DAVID SCHACHTSCHNEIDER** | Customer Service | Log Out

Last login Wednesday 01/19/22, 03:17 PM CST



You have <u>11 new</u> LaunchPoint messages



| | |
|---|---|
| Book Transfers | |
| Image Access | |
| Information Reporting | |
| Stop Payments | |
| **Wire Transfers** | |
| Initiate Wire Transfer | |
| Initiate Batch | |
| Import | |
| Approve Wire Transfers | |
| View Wire Activity | |
| Manage Repeat Codes | |
| Manage Templates | |
| View Reports | |
| Manage Settings | |

| | |
|---|---|
| LaunchPoint (11 New) | |
| Dashboard | |
| Personal Settings | |
| System Administration | |
| Document Xchange | |
| Onboarding Tracker | |
| Service Guide | |
| Help With SinglePoint | |
| Customer Service | |

## View Wire Transfer Detail

Help with this page

**Fed Wire Transfer (FED)**

[ Cancel ]  [ View History ]

Control Number
129111680

PAR Number
220125014442

Template ID
FCI-StarRanc

Repeat Code Nickname

Debit Account Number - Debit Account Name
████ 4681 - StarServe Acct

Amount
$97,017.08

Send Date (MM/DD/YYYY)
01/25/2022

**Beneficiary Bank Information (BBK)**
Bank ABA (Routing / Transit Number)
122228003

Name
Sunwest Bank

Address Line 1

Address Line 2

City
Tustin

State or Territory
CA

Bank Account Number
████

**Beneficiary Information (BNF)**
Name
FCI Lender Services, Inc.

Account Number
████

Address Line 1

Address Line 2

City

State or Territory

Notification Email Address
(If populated, email will be sent)

**Beneficiary Details**
Reference for Beneficiary (RFB)
acct no399351348

Originator to Beneficiary Information (OBI)
275 Long Ranch Road

St Helena CA 94574

**Bank to Bank Information (BBI)**
Bank to Bank Information

**Originator Information (ORG)**
Name
IEP, LLC - D.Schachtschneider

Account Number

Address Line 1

Address Line 2

City

State or Territory

[ Cancel ]  [ View History ]

© 2005 - 2022 U.S. Bank

Go to Mobile SinglePoint

Privacy & Security | Site Map

Download IBM® Security Trusteer Rapport™

Case: 22-30476   Doc# 47   Filed: 10/24/22   Entered: 10/24/22 18:26:44   Page 36 of 81

# Exhibit "D"

**COMP**
COHEN l JOHNSON
H. STAN JOHNSON, ESQ.
Nevada Bar No. 265
sjohnson@cohenjohnson.com
375 E. Warm Springs Rd. Ste. 104
Las Vegas, Nevada 89119
Telephone:  (702) 823-3500
Facsimile:    (702) 823-3400
*Attorneys for Plaintiff*

## EIGHTH JUDICIAL DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| STEFAN GRAFSTEIN, an individual, | Case No.: A-22-857055-C |
| Plaintiff, | Dept. No. 4 |
| vs. | |
| IMPACT ENERGY PARTNERS, LLC, a California limited liability company; DAVID"GAIAN" SCHACHTSCHNEIDER, an individual; SAHIL SINGH, an individual and DOES 1 through 10, inclusive; and ROE CORPORATIONS 11 through 20, inclusive, | **ARBITRATION EXEMPTION CLAIMED:** **Declaratory Relief** |
| Defendants | |

## AMENDED COMPLAINT

Plaintiff Stefan Grafstein, ("Plaintiff"), by and through his attorneys, for his Amended Complaint against the Defendants allege as follows:

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

## I. NATURE OF ACTION

1. This action concerns the breach of several agreements between Plaintiff and the Defendants and the misrepresentations that induced the Plaintiff to enter into these agreements and the transfer of extremely valuable assets to the Defendants.

2. Plaintiff alleges that all Defendants conspired and committed wrongful acts in violation of Federal and State Securities Laws and other statutes, as well as actual and constructive fraud and/or negligent misrepresentations, breaches of fiduciary duties and contracts, and other torts for which Plaintiff seeks relief and remedies herein.

3. Plaintiff seeks damages and/or rescission of the agreements and transactions at issue, with restitution, monies on common counts, and other relief in this action.

## II. PARTIES

4. Plaintiff Stefan Grafstein ("Plaintiff") is a successful businessperson, entrepreneur, and investor in early-stage cryptocurrencies.

5. Defendant David Schachtschneider, aka David Albert Michlin, aka David Gaian ("Schachtschneider") is an individual and, upon information and belief, a resident of the State of California.

6. Defendant Impact Energy Partners, LLC ("Impact Energy") is a limited liability company organized under the laws of the State of California. Schachtschneider is the sole member and manager of Impact Energy. Plaintiff is informed and believes that Impact Energy is the alter ego of Schachtschneider with no legitimate business activities.

7. Defendant Sahil Singh ("Singh") is an individual and, upon information and belief, a resident of the State of Texas.

8. Plaintiff alleges, on information and belief, that at all relevant times, Schachtschneider and Singh acted as an agent, co-conspirator, and/or joint venturer of one another and in doing the things alleged herein acted within the course and scope of such agency, alter ego, and/or in furtherance of such conspiracy or joint venture.

9. Each defendant is, and has been at all relevant times, combining, scheming, and conspiring with the other defendants for unlawful purposes and intentions.

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

10. Defendants each have committed the overt acts, omissions, activities, communications, concealments, and transactions described herein, as part of and to implement and perform their unlawful conspiracy.

11. There may be other persons or entities, whether individuals, corporations, associations, or otherwise, who are or may be legally responsible for the acts, omissions, circumstances, happenings, and/or damages or other relief requested by this Complaint. The true names and capacities of DOES 1 through 10 and ROES 11 through 20 are unknown to Plaintiff, who sue those defendants by such fictitious names. Plaintiff will seek leave of this Court to amend this Complaint to insert the proper names of the defendants when such names and capacities become known to Plaintiff.

## III.   JURISDICTION AND VENUE

12. Jurisdiction and venue are proper in this court pursuant to that certain Collateralized Private Purchase Agreement dated December 24, 2021, between Plaintiff and the Schachtschneider Parties (the "CPPA"), as amended by that certain Amendment to Collateralized Private Purchase Agreement dated March 17, 2022, between Plaintiff, the Schachtschneider Parties, and Singh (the "ACPPA"), and that certain that certain Private Purchase Agreement dated March 25, 2022, between Plaintiff and Singh, as buyer ("PPA").

13. The CPPA, ACPPA, and PPA contain identical venue clauses stating that "[t]he sole jurisdiction for any litigation arising out of this Agreement will be an appropriate federal or state court located in Clark County, Nevada."

## III.   FACTS AND CONTENTIONS

14. The term "digital asset" generally refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," digital "coins," and digital "tokens".

15. A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages. The system relies on cryptographic techniques for secure recording of transactions.

Case: 22-30476    Doc# 47    Filed: 10/24/22    Entered: 10/24/22 18:26:44    Page 40 of 81

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

16.     Blockchains typically employ a consensus mechanism to "validate" transactions, which, among other things, aims to achieve agreement on a data value or on the state of the ledger.

17.     Digital tokens may be traded on digital asset trading platforms in exchange for other digital assets or fiat currency (legal tender issued by a country), at times by being allocated to investors' accounts in the records of the platform (i.e., "off-chain"), without necessarily being transferred from one blockchain address to another (i.e., "on-chain").

18.     In or about November of 2021, Plaintiff was introduced to Schachtschneider through a mutual acquaintance who informed Plaintiff that Schachtschneider was looking to purchase large quantities of digital assets in exchange for a premium.

19.     On or about November 30, 2021, Plaintiff and Schachtschneider participated in a conference call in which Schachtschneider presented a deal in which Schachtschneider would purchase $2 million worth of Bitcoin.

20.     In the following weeks, Plaintiff and Schachtschneider participated in additional calls in which they discussed the terms of the deal.

21.     Schachtschneider represented that he was purchasing the Bitcoin on behalf of a member of a wealthy family in a foreign country that wished to remain anonymous.

22.     Schachtschneider represented that he would not earn a profit or commission but was arranging the deal because the buyer's family was negotiating a $250 million deal with Star Scientific Limited ("Star Scientific"), an Australian public company in which Schachtschneider is a major stockholder.

23.     Schachtschneider represented that Star Scientific had performed substantial due diligence on the buyer's family in connection with the purported $250 million deal.

24.     Schachtschneider represented that he had direct communications with Star Scientific's executives in order to verify the buyer's identity.

25.     Schachtschneider represented that the head of the buyer's family had recently met with the ambassador of Australia because the Star Scientific deal involved hydrogen exports in large quantities from India to Australia.

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

26.     Schachtschneider represented that the buyer would pay a substantial premium for Bitcoin because he needed cryptocurrency to make payments to contractors and employees in different countries.

27.     Schachtschneider represented that the buyer was interested in doing additional Bitcoin deals and that Plaintiff would have future opportunities to sell digital assets for a premium on a monthly basis.

28.     Schachtschneider agreed to pledge his own shares of Star Scientific as collateral to secure payment of the purchase price for the Bitcoin.

29.     Schachtschneider represented that the pledged shares were worth $500 per share and had an aggregate value of more than $5 million.

30.     Schachtschneider also urged Plaintiff to become an investor in Star Scientific, claiming that the $250 million deal with the buyer's family would allow Star Scientific to scale their Hydrogen Energy Release Optimiser ("HERO") technology.

31.     Schachtschneider represented that he was starting a fund in Luxemburg with a $15 million line of credit for a leveraged buyout of Star Scientific shares, which would increase the value of the shares significantly in the following year.

32.     Schachtschneider also represented that he had formed Impact Energy to promote investments in clean energy technology and that Impact Energy owned valuable real estate in northern California.

33.     Schachtschneider represented that he intended to use the properties Impact Energy owned to host conferences and "Ted Talks" regarding renewable energy technology.

34.     Based on Schachtschneider's representations, Plaintiff agreed to sell $2 million worth of Bitcoin to Schachtschneider and Impact Energy (collectively, the "Schachtschneider Parties").

35.     On December 24, 2021, Plaintiff, as seller, and the Schachtschneider Parties, as buyer, entered into the CPPA.  A true and correct copy of the CPPA is attached as Exhibit 1.

36.     In the CPPA, the Schachtschneider Parties agreed to purchase $2 Million worth of Bitcoin (defined as the "Digital Assets") in exchange for $2,400,000.00 ("Purchase Price") payable within thirty (30) calendar days of the date of transfer.

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

37.    The Purchase Price was intended to constitute repayment of the original market value of the Digital Assets ($2,000,000.00) and payment of a twenty percent (20%) premium ($400,000.00).

38.    The Schachtschneider Parties also agreed to pay all costs incurred by Plaintiff in connection with the transaction and any additional "Hedge" or "Late Fee" amounts described in Paragraphs 1(d) and 1(g) of the CPPA.

39.    To secure payment of the Purchase Price, Schachtschneider pledged 10,870 shares of Star Scientific stock (the "Collateral Shares").

40.    On December 25, 2021, Plaintiff transferred the Digital Assets to a digital wallet designated by the Schachtschneider Parties.

41.    The Schachtschneider Parties failed to make any payments towards the Purchase Price within thirty (30) days of the date of transfer as required by the CPPA.

42.    Plaintiff subsequently demanded that Schachtschneider disclose the identity of the ultimate buyer.

43.    Schachtschneider revealed that the ultimate buyer was Singh and claimed that Singh's father was a billionaire from India who was negotiating the alleged $250 million deal with Star Scientific.

44.    Plaintiff also demanded that Schachtschneider arrange a face-to-face meeting with Singh.

45.    Plaintiff subsequently flew to Austin, Texas to meet Schachtschneider and Singh.

46.    Singh picked Plaintiff up from the airport in a purple 2022 Bentley Flying Spur.

47.    To induce Plaintiff to extend the date of payment, Singh presented documents purporting to show that he had the financial means to pay the Purchase Price for the Digital Assets.

48.    Specifically, Singh presented falsified and/or forged bank statements purporting to show deposits in excess of $500,000 and mortgage documents purporting to show that Singh's family-owned valuable real estate projects in India, including shopping malls.

49.    Singh also made claims about who is father was and invited Plaintiff to do future investments with Singh's family.

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

50.     The parties then discussed amending the CPPA to extend the date of payment.

51.     The parties agreed that in exchange for an extension, both Schachtschneider and Singh would pledge additional collateral.

52.     Singh also agreed to sign the agreement as a guarantor.

53.     On March 17, 2022, Plaintiff, as seller, the Schachtschneider Parties, as buyer, and Singh, as guarantor, executed the ACCPA.  A true and correct copy of the ACPPA is attached as Exhibit 2.

54.     In the ACPPA, the Schachtschneider Parties admitted to being in full default and breach of the CPPA for failing to make any payments to Plaintiff within the time agreed to in the CPPA.

55.     As consideration for Plaintiff extending the date of payment to March 31, 2022, the Schachtschneider Parties promised to pay Plaintiff the total outstanding debt ($3,600,000.00) (defined in the ACPPA as "Modified Sales Proceeds") with interest compounding daily at a rate of 0.67%.

56.     The Modified Sales Proceeds consisted of the original principal amount ($2,000,000), the 20% premium due to Plaintiff ($400,000), additional premiums for each 30-day period beyond the original date payment became due ($800,000), and a late fee ($400,000).

57.     As guarantor, Singh agreed that in the event the Schachtschneider Parties breached, he would immediately pay all amounts owed to Plaintiff.

58.     Singh also acknowledged in the ACPPA that he was a third-party beneficiary of the Digital Assets transferred pursuant to the CPPA.

59.     Despite the execution of the ACPPA, neither the Schachtschneider Parties nor Singh have made any payments or pledged any additional collateral.

60.     In a separate transaction on March 25, 2022, Plaintiff and Singh entered into the PPA, which involved Plaintiff's transfer of an additional 5.41 Bitcoin to Singh in exchange for $740,000.00 to be paid by March 31, 2022. A true and correct copy of the PPA is attached hereto as Exhibit 3.

Case: 22-30476   Doc# 47   Filed: 10/24/22   Entered: 10/24/22 18:26:44   Page 44 of 81

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

61.     Singh claimed that a business associate in the United Kingdom was going to lose $2 million on an options contract unless he could cover the cost of the drop in price of Ethereum, another digital currency.

62.     Singh claimed that if he was able to cover the $2 million loss, his business associate in the United Kingdom would return $1 million to Singh, which would be used to pay Plaintiff under the PPA.

63.     Accordingly, on or about March 25, 2022, Plaintiff transferred an additional 5.41 Bitcoin to Singh pursuant to the PPA.

64.     Singh failed to make any payments to Plaintiff under the PPA on or before March 31, 2022, claiming that his business associate never paid him.

65.     When payment did not arrive, Singh claimed that he would borrow money against his own real estate and real estate his family owned, in addition to withdrawing money from a family trust.

66.     Singh later claimed that he was unable to transfer funds because of liquidity issues related to his family's banking projects.

67.     Between May and July of 2022, Singh continued to represent to Plaintiff that he intended to make payment to Plaintiff in full, but Plaintiff still has not made any payments to Plaintiff.

68.     During this time, the cryptocurrency markets suffered heavy losses, but Plaintiff did not liquidate his investments in digital assets because he still believed that Defendants intended to make payment in full or pledge additional collateral, including a security interest in real estate owned by Impact Energy and additional shares in Star Scientific.

69.     Despite repeated demands, however, Defendants failed to make any payments or pledge any additional collateral.

70.     Plaintiff subsequently hired a private investigator and a firm that specializes in tracing cryptocurrency transactions.

71.     Plaintiff's investigation revealed that Singh had no legitimate business purpose for purchasing the digital assets.

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

72.     Instead of using the digital assets for the purposes Defendants represented, the Defendants transferred the Digital Assets to known fraudsters, scammers, darknet marketplaces, and illegal gambling sites, before cashing out the remaining digital assets.

73.     In addition, Plaintiff's investigation suggests that the documents that Singh presented Plaintiff to induce him to enter into the ACPPA were forged.

74.     Plaintiff also discovered that the purple 2022 Bentley Flying Spur that Singh used to pick up Plaintiff from the airport was purchased only days before Plaintiff met with Singh in Austin, Texas.

75.      More recently, Plaintiff discovered that the real estate owned by Impact Energy that Schachtschneider said could be pledged as additional is currently in foreclosure.

76.     Plaintiff is also informed and believes that the shares of Star Scientific that were pledged as collateral are actually worthless and that Schachtschneider is using Star Scientific shares as part of a sophisticated pump and dump scheme.

**IV.    CLAIMS FOR RELIEF**

### FIRST CLAIM FOR RELIEF

**Breach of Contract**

(On Behalf of Plaintiff Against all Defendants)

77.     Plaintiff repeats and incorporates by reference the allegations set forth above as though fully set forth herein.

78.     Plaintiff and Defendants entered into a valid and existing contract, the CPPA, as amended by the ACPPA (collectively, the "Secured Agreement"), pursuant to which Plaintiff sold Digital Assets to Defendants valued at $2,000,000.00 as of the date of transfer.

79.     In consideration of the sale of the Digital Assets, Defendants agreed to pay $3,600,000.00 to Plaintiff plus interest and other sums as set forth in the Secured Agreement.

80.     Plaintiff fully performed his duties under the Secured Agreement by delivering the agreed Digital Assets to Defendants on December 25, 2021.

Case: 22-30476    Doc# 47    Filed: 10/24/22    Entered: 10/24/22 18:26:44    Page 46 of 81

81.     Despite Plaintiff's full performance of his obligations under the Secured Agreement, the Schachtschneider Parties materially breached the Secured Agreement by failing to make any payments to Plaintiff.

82.     As a direct and proximate result of Defendants' breach, Plaintiff has suffered damages in the amount in excess of $15,000.00, the exact amount of which shall be proven at trial.

83.     As a direct and proximate result of Defendants' breaches of the Secured Agreement, Plaintiff has been forced to retain the services of attorneys to assist in collecting the sums due and pay those attorneys the reasonable fees and expenses incurred in pursuing this matter.

84.     Under the terms of the Secured Agreement, Plaintiff is entitled to reimbursement for any and all attorneys' fees and all other costs and expenses associated with bringing a legal action to recover damages and losses.

## SECOND CLAIM FOR RELIEF
### Violation of NRS 90.460, 90.570 & 90.660
(On Behalf of Plaintiff Against all Defendants)

85.     Plaintiff repeats and incorporates by reference the allegations set forth above as though fully set forth herein.

86.     Nevada Revised Statutes Section 90.660(1), imposes civil liability on anyone who violates a number of other securities statutes, including but not limited to Sections 90.460 and 90.570(2). Section 90.570(2) provides that it is unlawful for any person, in connection with the offer or sale of a security to directly, or indirectly to: "1. Employ any device, scheme or artifice to defraud; 2. Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading in the light of the circumstances under which they are made; or 3. Engage in an act, practice of course of business which operates or would operate as a fraud or deceit upon a person."

87.     Defendants developed a scheme in violation of Section 90.570, by offering securities to Plaintiff, by making untrue statements of material fact and by omitting to state

Case: 22-30476   Doc# 47   Filed: 10/24/22   Entered: 10/24/22 18:26:44   Page 47 of 81

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

material facts necessary to make the statements made not misleading, or to engage in a course of business that operates as a fraud or deceit upon another person.

88. Nevada Revised Statutes section 90.460 provides that it is unlawful for any person to offer or sell in Nevada any security unless such security has been qualified/registered or unless such security is exempted from such qualification/registration.

89. Defendants, in violation of Section 90.460, offered Plaintiff securities that were not qualified/registered and that were not exempt from such qualification/registration.

90. Nevada Revised Statutes section 90.660(1) provides that a person who offers or sells a security in violation of Nevada Revised Statutes sections 90.460 or 90.570(2) "is liable to the person purchasing the security."

91. Nevada Revised Statutes section 90.660(4) provides secondary liability for any "agent" of "the person liable" for the above violations for purposes of the fraudulent scheme and the selling of unregistered securities.

92. Defendants knew, at all relevant times, that offering the securities to Plaintiff was a fraudulent scheme to offer to potential investors (such as Plaintiff) unregistered/unqualified securities that were based on material misrepresentations or omissions of material fact. Defendants knew or should have known, at all relevant times, that securities offered to Plaintiff were unregistered/unqualified securities that were not exempt/qualified from registration.

93. The aforementioned acts by Defendants were done intentionally in order to, among other things, induce Plaintiff into entering into contractual relationships with the Defendants and in transferring valuable assets to Defendants.

94. Defendants possessed both actual knowledge and constructive knowledge that they were engaged in a fraudulent scheme and was offering securities to Plaintiff, that were not registered and that were based on material omissions and material misrepresentations to induce Plaintiff into entering into contractual relationships and transferring valuable assets to Defendants.

95. As a proximate result of the above conduct Plaintiff was damaged in an amount in excess of $15,000 and to be proven at trial.

Case: 22-30476    Doc# 47    Filed: 10/24/22    Entered: 10/24/22 18:26:44    Page 48 of 81

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

96.     Under the terms of the Secured Agreement, Plaintiff is entitled to reimbursement for any and all attorneys' fees and all other costs and expenses associated with bringing a legal action to recover damages and losses.

## THIRD CLAIM FOR RELIEF

### Breach of Covenant of Good Faith and Fair Dealing

(On Behalf of Plaintiff Against all Defendants)

97.     Plaintiff repeats and incorporates by reference the allegations set forth above as though fully set forth herein.

98.     Plaintiff and Defendants entered into a valid and existing contract, the Secured Agreement, which is governed by Nevada law.

99.     In every contract in Nevada, there exists an implied covenant of good faith and fair dealing.

100.    Defendants, therefore, owed Plaintiff a duty of good faith and fair dealing pursuant to the Secured Agreement.

101.    Defendants acted in a manner that was unfaithful to the parties' agreement by failing to make any payments to Plaintiff.

102.    As a result, Plaintiff's justified expectations were denied by Defendants' actions.

103.    As a direct and proximate result of Defendants' breach, Plaintiff has suffered damages in the amount in excess of $15,000.00, the exact amount of which shall be proven at trial.

104.    As a direct and proximate result of Defendants' breaches of the Secured Agreement, Plaintiff has been forced to retain the services of attorneys to assist in collecting the sums due and pay those attorneys the reasonable fees and expenses incurred in pursuing this matter.

105.    Under the terms of the Secured Agreement, Plaintiff is entitled to reimbursement for any and all attorneys' fees and all other costs and expenses associated with bringing a legal action to recover damages and losses.

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

## FOURTH CLAIM FOR RELIEF

### Breach of Contract

(On Behalf of Plaintiff Against Singh)

106.    Plaintiff repeats and incorporates by reference the allegations set forth above as though fully set forth herein.

107.    Plaintiff and Singh entered into a valid and existing contract, the PPA, whereby Plaintiff sold Digital Assets to Singh valued in the amount of $250,000.00. The PPA is governed by Nevada law.

108.    In consideration of the sale of the Digital Assets, Singh agreed to pay the total purchase price of $740,000.00, plus interest compounding daily at a rate of 1.0%.

109.    Singh agreed to pay Plaintiff the total purchase price plus interest within five (5) days from receipt of the Digital Assets.

110.    Plaintiff fully performed his duties under the PPA by delivering the Digital Assets to Singh.

111.    However, despite Plaintiff's full performance under the PPA, Singh materially breached his obligations under the PPA by failing to make any payments to Plaintiff within the period stated in the PPA.

112.    As a direct and proximate result of Singh's breach of the PPA, Plaintiff has suffered damages in the amount in excess of $15,000.00, the exact amount of which shall be proven at trial.

113.    As a direct and proximate result of Singh's breach of the PPA, Plaintiff has been forced to retain the services of attorneys to assist in collecting the sums due and pay those attorneys the reasonable fees and expenses incurred in pursuing this matter.

114.    Under the terms of the PPA, Plaintiff is entitled to reimbursement for any and all attorneys' fees and all other costs and expenses associated with bringing a legal action to recover damages and losses.

115.

## FIFTH CLAIM FOR RELIEF

### Breach of the Covenant of Good Faith and Fair Dealing

(On Behalf of Plaintiff Against Singh)

116.    Plaintiff repeats and incorporates by reference the allegations set forth above as though fully set forth herein.

117.    Plaintiff and Singh entered into a valid and existing contract, the PPA, which is governed by Nevada law.

118.    In every contract in Nevada, there exists an implied covenant of good faith and fair dealing.

119.    Defendant Singh owed Plaintiff a duty of good faith and fair dealing pursuant to the PPA that they entered into.

120.    Defendant Singh acted in a manner that was unfaithful to the parties' PPA by failing to pay the agreed total purchase price within the five (5) – day period.

121.    As a direct and proximate result of Singh's breach of the PPA, Plaintiff has suffered damages in the amount in excess of $15,000.00, the exact amount of which shall be proven at trial.

122.    As a direct and proximate result of Singh's breach of the PPA, Plaintiff has been forced to retain the services of attorneys to assist in collecting the sums due and pay those attorneys the reasonable fees and expenses incurred in pursuing this matter.

123.    Under the terms of the PPA, Plaintiff is entitled to reimbursement for any and all attorneys' fees and all other costs and expenses associated with bringing a legal action to recover damages and losses.

/ / /

/ / /

### SIXITH CLAIM FOR RELIEF

**Fraud / Intentional Misrepresentation**

(On Behalf of Plaintiff Against All Defendants)

124.    Plaintiff repeats and incorporates by reference the allegations set forth above as though fully set forth herein.

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

125. Based on the allegations set forth herein, Plaintiff is informed and believes that Defendants maliciously conspired with one another to fraudulently induce Plaintiff to enter into the CPPA, as amended by the ACPPA, and the PPA (collectively, the "Purchase Agreements") and transfer the Digital Assets to Defendants for no consideration.

126. Defendants knowingly made false representations by pretending that Singh was the son of a billionaire from India seeking to purchase large quantities of digital assets for a premium, pretending that Singh's family was negotiating a $250 million deal with Star Scientific, and pretending that the digital assets would be used for legitimate business purposes.

127. Defendants intended Plaintiff to rely on the false representations alleged herein to induce him to enter into the Purchase Agreements and transfer the Digital Assets to them for no consideration.

128. In entering into the Purchase Agreements and transferring the Digital Assets to Defendants, Plaintiff justifiably relied on Defendants' false representations, as Plaintiff insisted on conducting substantial due diligence and being provided proof of Defendants' ability to pay.

129. Unfortunately, the documents and information that Defendants provided Plaintiff were false.

130. After Defendants failed to make any payments pursuant to the CPPA, Defendants perpetuated their fraudulent scheme by agreeing to make full payment with interest and inducing Plaintiff to transfer more digital assets to Defendants.

131. As a result of Defendants' knowingly false and fraudulent misrepresentations and Plaintiff's reliance thereupon, Plaintiff has suffered damages in excess of $15,000.00, the exact amount of which will shall be determined at trial.

132. Defendants' actions were committed with malice and oppression, entitling Plaintiff to punitive damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### Alternative Claim for Negligent Misrepresentation

(On Behalf of Plaintiff Against All Defendants)

133. Plaintiff repeats and incorporates by reference the allegations set forth above as though fully set forth herein.

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

134.     Plaintiff and Defendant entered into valid and existing contracts, the Purchase Agreements, whereby Plaintiff sold Digital Assets to Defendants valued at $2,250,000.00.

135.     To induce Plaintiff to enter into the Purchase Agreements, Defendants, negligently represented to Plaintiff that Defendants had the ability to comply with their obligations to pay the total purchase price within the relevant payment periods set forth in the Purchase Agreements.

136.     Upon information and belief, Singh has a credit score in the low 600s and a credit limit of $2,500.

137.     In addition, despite the fact that the real estate Schachtschneider agreed to pledge as additional collateral is now in foreclosure, Schachtschneider repeatedly claimed that he could sell the property to satisfy his obligations to Plaintiff.

138.     Plaintiff, in entering into the Purchase Agreements, reasonably relied upon Defendants' negligent misrepresentations.

139.     As a result of Defendants' negligent misrepresentations and Plaintiff's reliance thereupon, Plaintiff has suffered damages in excess of $15,000.00, the exact amount of which will shall be determined at trial.

## EIGHTH CLAIM FOR RELIEF

### Alternative Claim for Unjust Enrichment

(On Behalf of Plaintiff Against All Defendants)

140.     Plaintiff repeats and incorporates by reference the allegations set forth above as though fully set forth herein.

141.     By virtue of the conduct described above, Plaintiff conferred a benefit on Defendants by transferring the Digital Assets to Defendants.

142.     Plaintiff's investigation shows that Defendants diverted the Digital Assets to personal and non-business purposes, including the purchase of Bentley.

143.     Thus, Defendants have been unjustly enriched at the expense of and to the detriment of Plaintiff and should be required to disgorge all of payments received.

Case: 22-30476    Doc# 47    Filed: 10/24/22    Entered: 10/24/22 18:26:44    Page 53 of 81

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

144.    As a result of the acts and omissions of Defendants alleged herein, Plaintiff has suffered damages in an amount exceeding $15,000, the exact amount of which shall be proven at trial.

## NINETH CLAIM FOR RELIEF

### Civil Conspiracy

(On Behalf of Plaintiff Against All Defendants)

145.    Plaintiff repeats and incorporates by reference the allegations set forth above as though fully set forth herein.

146.    As alleged herein, Defendants, acting in concert, intended to accomplish an unlawful objective for the purpose of harming Plaintiff.

147.    As a result of these actions, Plaintiff has suffered damages in excess of $15,000.00 and to be proven at trial.

## TENTH CLAIM FOR RELIEF

### Deceptive Trade Practices

(On Behalf of Plaintiff Against All Defendants)

148.    Plaintiff realleges and incorporates by reference the allegations contained in all previous paragraphs, inclusive, as though fully set forth herein.

149.    Defendants, and each of them, have violated the Nevada Deceptive Trade Practices Act, NRS 598.0915(15), by knowingly making false representations by omission, including:

a.    That they would pay for the valuable assets that were transferred to them pursuant to their agreements;

b.    The value of securities transferred to the Plaintiff as collateral;

c.    Representations about the identify and wealth of persons involved in the transaction; and

d.    That the securities transferred to Plaintiff were valuable collateral because of other pending investments of persons involved in the transaction.

Case: 22-30476   Doc# 47   Filed: 10/24/22   Entered: 10/24/22 18:26:44   Page 54 of 81

150.     Defendants, and each of them, have violated the Nevada Deceptive Trade Practices Act, NRS 598.0923(2) by knowingly failing to disclose material facts related to the transaction, including:

a.     The existence of conflicts of interest and alternative motives of the persons involved in the transaction;

b.     The true identity and wealth of persons involved in the transactions; and

c.     Representations about other pending transactions that would make the securities transferred to Plaintiff more valuable and secure.

151.     Defendants, and each of them, have violated the Nevada Deceptive Trade Practices Act, NRS 598.0923(3) by knowingly violating myriad regulations relating to the sale, transfer and offering of securities, including, but not limited to:

a.     Failing to disclose the true risk and value of the securities transferred to Plaintiff in violation of securities law as set forth above;

b.     Failing to promptly inform Plaintiff of the failure of other transactions that would affect the value of the securities transferred to Plaintiff;

c.     Failing to disclose the true value of the securities and that there existed a very small and illiquid market for the securities that affect the true value of the securities; and

d.     Engaging in conduct in violation NRS 90.460, 90.570 & 90.660.

152.     Defendants are responsible for each of the violations of NRS 598.0915(15), NRS 598.0923(2), and NRS 598.0923(3) committed by themselves or in conspiracy with other defendants including Doe and Roe defendants.

153.     Defendants each had a statutory duty to refrain from knowingly committing deceptive trade practices in the course of their businesses.

154.     As a direct and proximate result of the foregoing deceptive trade practices,

155.     Plaintiff has suffered damages in excess of $15,000.00, according to proof at trial.


**ELEVENTH CLAIM FOR RELIEF**

**Declaratory Relief**

COHEN JOHNSON, LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, Nevada 89118
(702) 823-3500 FAX: (702) 823-3400

156.     Plaintiff realleges and incorporates by reference the allegations contained in all previous paragraphs, inclusive, as though fully set forth herein.

157.     That as a result of the aforementioned breaches and wrongful actions, a justiciable controversy exists relating to the rights and ownership of the assets transferred to the Defendants.

158.     That Plaintiff requests a declaratory ruling by this court declaring that the Defendants, and each of them, are not entitled to the possession of any assets transferred to the Defendants and that they must return the assets to the Plaintiff in addition to the payment of consequential damages.

159.     That Plaintiff have been required to retain the services of an attorney to prosecute this matter and is entitled to be reimbursed for its attorney's fees and costs incurred herein.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby prays for the following reliefs:

1.  Damages against the Defendants in an amount in excess of $15,000, the exact amount of which shall be proven at trial;

2.  Pre-judgment and post-judgment interest;

3.  Reasonable attorneys' fees;

4.  Punitive Damages in amount to be determined at trial;

5.  Any costs incurred as a result of this suit; and

6.  Such other and further relief as the Court may deem just and proper.

DATED this 13th day of September 2022.

COHEN JOHNSON, LLC

/s/ H. Stan Johnson

H. STAN JOHNSON, ESQ.
Nevada Bar No. 0265
375 E. Warm Springs Road, Suite 104
Las Vegas, NV 89119
Attorney for Plaintiff

# EXHIBIT 1

# EXHIBIT 1

# COLLATERALIZED PRIVATE PURCHASE AGREEMENT

This Collateralized Private Purchase Agreement (the "**Agreement**") is entered into this <u>24th</u> day of December 2021 (the "**Effective Date**"), by and between David "Gaian" Schachtschneider , personally, and as authorized signatory for Impact Energy Partners, LLC, California a limited liability company (collectively, the "**Buyer**"), with its  principal address at 340 S. Lemon Ave., Suite 1964, Walnut, CA, 91789, and Stefan Grafstein (the "**Seller**"), with a mailing address of 220 Calle Manuel Domenech #750, San Juan, Puerto Rico 00918. For purposes of this Agreement, Buyer, Seller each will be referred to individually as a "Party" and together as the "Parties."

**WHEREAS,** Buyer agrees to purchase and Seller has agreed to sell Bitcoin (the "Digital Assets") valued in the amount of two million dollars ($2,000,000.00 USD) at the time of its transfer by Seller to Buyer pursuant to the terms reflected in this Agreement;

**WHEREAS,** Buyer has agreed to transfer Collateral Shares (defined below) to secure the purchase transaction in the form of s total of ten thousand eight hundred and seventy (10,870) single-class of full voting registered shares, free and clear of any encumbrances and fully in his direct personal/company ownership, of Star Scientific Limited, an Australian public company with its principal office located at Suite 3.01, Level 3, 828 Pacific Highway, Gordon NSW 2072, Australia (the "Issuer");

**WHEREAS,** the purpose of this Agreement is to structure, bind, and constructively assist a Buyer and Seller in successfully transacting a sale of the Digital Assets at a premium to market within a specific amount of time, according to specific steps, and with terms supportive of the minimization of transaction risk and maximization of transaction value for Buyer and Seller alike;

**WHEREAS,** Seller has similarly delivered to Buyer basic KYC identity documents establishing himself as a businessperson and private party in good standing, as well as information on his receiving bank and proof of ownership of sufficient BTC to conduct and complete delivery of same as directed herein;

**WHEREAS,** Buyer is an esteemed shareholder of Star Scientific Limited in good standing with such company and Buyer has personally and professionally initiated, over-seen, and completed over 100 share transactions over the past ±3 years with Star Scientific Limited,  requiring the same steps which will be required in this transaction. Buyer has already set in motion, to complete the transfer of the Collateral Shares as detailed and directed herein, the transfer of the Collateral Shares, which transfer has been noted in a live three-way call between the Parties and a senior staff employee of Star Scientific Limited;

**WHEREAS,** Buyer and Seller acknowledge and agree that this Agreement shall be executed executed before Midnight on Friday, December 24th, 2021; that Seller will deliver to Buyer its personal identity and banking information and documentation consisting the following items: (a) copy of Seller's US driver's license; (b) copy of Seller's United States passport; (c) regardless of Seller's foreign mailing address previously provided, a valid US address as Seller's point of contact; (d) United States banking information for Seller's receiving bank to which Buyer shall wire payment of funds as described below, including the name of Seller's bank, bank wiring address, account number, ABA routing number, and a screenshot of Seller's name on a banking statement or online dashboard for Seller's receiving bank;

**WHEREAS,** immediately following the Parties' full execution of this Agreement via DocuSign, Seller agrees that it shall immediately transfer the Digital Assets (as defined below) to the Buyer's Wallet

Address, which Buyer has already provided to Seller with test transfer already in motion. Once the transfer of the Digital Assets has been received, Buyer will inform Seller of same. On Monday, December 27th, 2021, Buyer shall commence transfer process for sending an additional two million dollars ($2,000,000 USD) in Collateral Shares, as agreed upon between the Parties, to further ensure the over collateralization and additional security of the transaction contemplated herein;

**THEREFORE,** in exchange for these acts, promises and mutual covenants contained herein, along with other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller agree as follows:

1. **Buyer's Purchase of Digital Assets and Pledge of Collateral Shares.**

    (a) **Purchase of Digital Assets.** Buyer shall pay the Seller, as the total purchase price for the Digital Assets an amount equal to two million four hundred thousand U.S. dollars ($2,400,000.00 USD) ("the Purchase Price"). The Purchase Price shall be paid to Seller within thirty (30) calendar days of Seller's transfer of the Digital Assets to Seller according to written transfer instructions, including Buyer's Bitcoin wallet address, which Buyer shall provide to Seller promptly following the parties' execution of this Agreement. In the event that Buyer fails to remit payment of the Purchase Price in full to the Seller within thirty days of the Seller's transfer of the Digital Assets under this Agreement, the additional fees set forth in Paragraph 1(c) below shall apply.

    (b) **Collateral Shares**. Buyer hereby acknowledges and agrees it shall secure the transaction by transferring a total of ten thousand eight hundred and seventy (10,870) shares of single class, full-voting stock in the Issuer. Buyer has already completed documentation which has set-in motion official transfer of same to Seller. Buyer further agrees that it shall take all action necessary to perfect its transfer of the Collateral Shares and effect its conveyance to Seller for the duration of the time between Buyer's receipt of the Digital Assets for Seller to hold in its possession until Buyer's remittance of the Purchase Price according to the terms set forth in this Agreement. Upon remittance of the Purchase Price in full, along with any applicable additional amounts prescribed under Paragraph 1(c) below ("Payment in Full"), Seller agrees that it shall commence any and all action reasonable and necessary to reconvey the Collateral Shares to Buyer on the first business day following receipt of Payment in Full.

    (c) **Payment in Full.** "Payment in Full" shall be understood by the Parties to mean the total of the following amounts:

        (i) Repayment of the principle capital amount of the original market value of the Digital Assets ($2,000,000 USD);

        (ii) Payment of the twenty percent (20%) premium due to Seller ($400,000 USD);

        (iii) Any costs associated with its execution of the transaction incurred by Seller; and

        (iv) Any additional "Hedge" or "Late Fee" amounts described in Paragraphs 1(d) and 1(g) below.

    (d) **Hedge.** While the transaction itself secures a net hedge against BTC price decline during the period of engagement; the Parties agree that there shall also be a hedge against loss of potential gains which may occur during the period in which Seller has delivered the Digital Assets and so

does not have the Digital Assets in its possession to enjoy such market gains. Therefore, the Payment in Full amount shall also include any additional amount necessary to compensate Seller for the potential unrealized market value increase of the Digital Assets (the "Hedge"). The Hedge shall be calculated by multiplying the number of Bitcoins comprising the Digital Assets by the market price of Bitcoin on Kraken at the day and time of Buyer's remittance of payment to Seller, which Buyer and Seller shall confirm with one another at such time, less the original principle value of the Digital Assets ($2,000,000 USD).

(e) **Remittance of Payment in Full.** After Buyer has remitted Payment in Full to Seller, Seller has two options in relation to accountably resolving his responsibilities for discontinuation of the holding of the collateralizing shares:

    (i) Seller may request and Buyer shall allow Seller to purchase a portion of the Collateralizing Shares, up to $2,000,000, at a discount-to-market of 20% as established by recent, documented purchase and sale transactions for the Collateral Shares at the time of Seller's request to purchase the Collateral Shares at the 20% discount-to-market price; or

    (ii) Seller shall promptly commence any and all action reasonable and necessary to reconvey the Collateral Shares to Buyer on the first business day following receipt of Payment in Full.

(f) **Prepayment.** Buyer shall have the unilateral right to make prepayment of the Purchase Price. However, and for the avoidance of doubt, Buyer's election to prepay the outstanding balance of the Purchase Price within thirty (30) days or less following Buyer's receipt of the Digital Assets shall not relieve Seller of its obligation to pay to Seller the premium of twenty percent (20%) premium as consideration for Seller's participation in the transaction contemplated herein.

(g) **Late Payment; Default.** In the event that Buyer fails to remit Payment in Full to Seller within thirty (30) days of receipt of the Digital Assets, Buyer agrees to pay a late fee ("Late Fee") consisting of the following:

    (i) Thirteen-thousand three-hundred and thirty-three dollars ($13,333.00 USD) Late Fee for each day past the initial thirty (30) day period following the time of Seller's receipt of the Digital Assets occurs under this Agreement, including the day upon which Payment in Full is finally remitted by Seller; and

    (ii) An additional premium amount of four hundred thousand dollars ($400,000 USD) for each additional thirty day period during which Payment in Full remains outstanding beginning on the thirty-first day following Buyer's actual receipt of the Digital Assets.

## 2. Term and Termination.

**(a)** **Term.** This Agreement shall be effective as of the Effective Date and continue in full force and effect until each Party has completed its performance of all obligations contemplated hereunder, unless extended in writing, executed by authorized representatives of the Parties, or otherwise terminated earlier in accordance with this Section.

**(b)** **Termination.** This Agreement may be terminated by the Parties as follows:

    (i)    By the non-breaching Party for "Cause." Cause means a material breach of this Agreement by either Party that has not been cured within ten (10) calendar days after delivery of written notice of the material breach (the "Material Breach") to the breaching Party by the non-breaching Party specifying the nature of the Material Breach and the specific actions required to be undertaken, if possible, by the breaching Party to correct the breach as soon as commercially possible. If this Agreement is terminated for Cause, the effective date of termination shall be ten (10) calendar days after written notice of the material breach is provided by the non-breaching Party, unless the breach is remedied prior to the expiration of ten (10) calendar days.

    (ii)   By Seller, effective immediately, if Buyer becomes insolvent, engages in anticipatory repudiation, seeks protection under the federal bankruptcy law, or becomes subject to liquidation or receivership proceeding; or

    (iii)  At such time that the performance obligations of the parties pursuant to this Agreement have been completed in their entirety, the Parties agree to enter into a subsequent written agreement under new terms for the ongoing transactions between the parties, or at any time the parties mutually elect to cease or retire the business relationship contemplated under this Agreement prior to initiation or following completion of the performance obligations required of each Party as contemplated hereunder pursuant to this written Agreement signed by the Parties hereto.

**(c) Default.**

**(i)** If Buyer has not remitted the Payment in Full amount to Seller within 60 days following the day upon which Seller actually received possession of the Digital Assets from Seller to its Bitcoin wallet address, Seller at its option may deliver written notice of default ("Notice of Default") to Buyer of its intention to liquidate the Collateral Shares, and Seller shall repurchase the Collateral Shares by tendering the then current amount due to Seller as Payment in Full. Failure by Seller to remit the then current Payment in Full amount shall entitle Seller to commence court action to recover the Payment in Full amount, along with any costs incurred by Seller due to Buyer's default, including without limitation all attorneys' fees and legal expenses.

**(ii)** Buyer acknowledges and agrees that in the event Seller initiates litigation for recovery of its damages, including without limitation the Paid in Full amount and legal fees incurred in connection with the recovery of its damages, pursuant to Paragraph 1(g) above, Buyer shall tender an executed stipulation to Buyer for counter-signature agreeing to the entry of Final Judgment and further agrees to not otherwise contest Seller's complaint, provided that the Paid in Full amount has not been remitted to Seller, in whole or in part, prior to the expiry of sixty (60) days following Buyer's actual receipt of the Digital Assets from Seller.

**(iii)** Buyer further acknowledges and agrees that in the event of a civil action commenced by Seller for recovery of any or all of the amount comprising the Payment in Full amount due

Seller at such time, Buyer will be responsible for reimbursing Seller for any and all attorneys' fees and all other costs and expenses associated with such legal action and recovery of its damages and losses pursuant to this Agreement.

3. **Confidential Information.**

(a) **Mutual Nondisclosure.** Neither Party shall use or disclose the other Party's Confidential Information (as hereinafter defined) except as expressly authorized by this Agreement, and each Party shall protect all such Confidential Information using the same degree of care that such Party undertakes with respect to the protection and security of its own proprietary and Confidential Information, but in no event with safeguards less than a reasonably prudent business or non-profit organization would exercise under similar circumstances in connection with its own Confidential Information.

(b) **Definition of Confidential Information.** "Confidential Information" means : (i) the terms or existence of this Agreement, technology, ideas, know-how, documentation, processes, trade secrets and other sensitive or proprietary information relating to the business of other the parties to this Agreement, and (ii) any other information whether disclosed orally, visually, or in written or digital media that is identified as "confidential," "proprietary," or similarly at the time of such disclosure.

(c) **Exclusions.** For the avoidance of doubt, Confidential Information shall not include any information that is:

(i) published or otherwise available to the public other than by breach of this Agreement;

(ii) rightfully received from a third party without confidential limitations;

(iii) independently developed as evidenced by appropriate records;

(iv) known to the Party prior to its first receipt of same from the other party as evidenced by appropriate records;

(v) hereinafter disclosed by the disclosing party to a third party without restriction on disclosure;

(vi) approved for public release by written authorization by the disclosing party;

(vii) Where disclosure is required by the Seller to assert any rights under this Agreement; or

(viii) As required to comply with the law or regulatory demands.

(d) **Legal Disclosure.** If any Confidential Information must be disclosed to any third party by reason of any legal, accounting or regulatory requirement beyond the reasonable control of said party, that party shall promptly notify the other party of such requirement, permit the other party (at its own expense) to seek an appropriate protective order from a court of competent jurisdiction, if appropriate and applicable, and cooperate with the other party in its efforts to do so.

4. **Mutual Indemnification.**

(a)   The Parties shall indemnify, defend and hold harmless the other party and its officers, directors, shareholders, members, managers, employees and agents, from and against any and all third-party claims, damages, liabilities, costs and expenses, including reasonable attorneys' fees and court costs, arising out of or in connection with (i) any material breach of this Agreement; (ii) the negligence or willful misconduct of the other party; or (iii) the other Party's noncompliance with applicable laws and regulations.

(b)   Each party's indemnification obligations under this Section shall be subject to: (i) receiving prompt written notice of the existence of any legal action described in subsection (a) or (b); (ii) control of the defense of such legal action; (iii) permitting the indemnified party to participate in the defense of any such legal action; and, (iv) receiving full cooperation of the indemnified party in the defense of any such legal action.

(c)   For the avoidance of doubt, notwithstanding the mutual indemnity obligations included in the section above, and any other obligations to make the other party whole of expenses as contemplated in this Agreement, and aside from general legal expenses incurred by the Parties in the negotiation of this Agreement, which Buyer shall pay, the Parties agree that each shall be responsible for paying its own tax obligations in connection with any expense incurred as a result of its engagement or participation in the current transaction contemplated herein.

## 5.   Representations and Warranties.

(a)   **Seller's Representations and Warranties.** Seller represents and warrants to Buyer that it owns all right, title, and interest in, or otherwise has full right and authority to transfer, convey, and sell any Digital Assets sent to Buyer's Bitcoin wallet address pursuant to this Agreement. Further, and subject to the other terms of this Agreement, Seller acknowledges and agrees that it shall take all action reasonable and necessary to reconvey any Collateral Shares conveyed to it as part of this transaction beginning on the first business day following Buyer's remittance in full of the Purchase Price to Seller along with any additional amount due to Seller as a late fee or other additional fee(s) incurred due to Buyer's failure to remit payment within thirty (30) days of receipt of the Digital Assets to its Bitcoin wallet address as prescribed hereunder.

(b)   **Buyer's Representations and Warranties.** Buyer represents and warrants to Seller that it owns all right, title, and interest in, without any encumbrances now or in the future, or otherwise has full right and unencumbered authority to transfer, convey, and sell any Collateral Shares provided to Buyer to secure the transaction contemplated hereunder. Buyer further represents and warrants that it shall make all commercially reasonable efforts to remit in full the Purchase Price to Seller within thirty (30) days of receipt of the Digital Assets. However, in the event that Seller is unable or fails to remit payment within the thirty (30) days of receipt of the Digital Assets to its Bitcoin wallet address, Seller agrees to pay to Buyer any late fees or additional fees as prescribed hereunder in addition to the full Purchase Price. The Buyer represents and warrants that neither the purposes of the transaction are to engage in any illegal activity nor that the use of the Bitcoin purchased from the Seller shall be to engage in any illegal activity. Buyer further represents and warrants that all pre-contractual due diligence information and materials supplied to Seller are true and correct to the best of its knowledge, and that Buyer shall notify Seller immediately in the event any information previously provided to Seller as part of pre-contractual due diligence is determined to be inaccurate or no longer true for any reason whatsoever.

(c)   **Limitation of Warranty.** Except for the express representations and warranties stated in this Agreement, the Seller makes no additional warranties whatsoever. The Parties explicitly disclaims any other warranties of any kind, either express or implied, including but not limited to warranties of merchantability or fitness for a particular purpose. Notwithstanding anything above, the Parties each acknowledge their ongoing obligation to ensure compliance with laws,

DocuSign Envelope ID: F5B895EE-CE97-4986-B323-CF679A851786

regulations and all other legal requirements applicable to the transaction(s) contemplated under this Agreement, including without limitation such legal requirements related to tax, securities, and the provision of financial services (i.e. FinCEN requirements).

**6. Miscellaneous.**

(a) **Preference for Future Transactions.** Buyer agrees that it shall give a right of first refusal to the Seller for participation in future transactions and business opportunities of a nature similar to the transaction contemplated herein provided that the Parties are mutually satisfied with the result of the initial transaction at hand. As such, the Parties acknowledge and understand that the initial transaction contemplated in this Agreement shall be considered a trial for potential ongoing transacting between or among the Parties, and that any such future transactions between the parties shall be governed by new contractual terms which may vary from the terms and conditions contemplated herein which shall be agreed upon in written format, signed by the Parties hereto prior to the commencement of such future transaction(s).

(b) **Notice.** All notices to a party hereunder shall be in writing, and delivered by certified mail, return receipt requested, overnight courier service, electronic mail, or by facsimile with confirmation by the above-described mailing methods to the address(es) set forth in the first part of this Agreement, or to a different address which a Party may give written notice of pursuant to this Section, including without limitation electronic mail or message. Notice will be deemed delivered and received on the date it is actually received by the recipient party.

(c) **Amendment.** This Agreement may not be amended except in writing, executed by each respective party or their authorized representatives and signatories.

(d) **Assignment.** This Agreement is not transferable, assignable, or delegable by Buyer or Seller in whole or in part, without the prior written permission of the other Party. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors, trustees, administrators, and assigns as permitted hereunder. Under no circumstances shall either party hereto be held liable for claims asserted by any third party. Seller has the option to syndicate the participation in this transaction.

(e) **Survival.** Any obligations or rights, including without limitation rights to Intellectual Property, of the parties created or agreed to under this Agreement that either party would reasonably expect the other to continue to respect and observe will survive termination or expiration of this Agreement for any reason. In addition, any payment obligations of Client that accrue prior to such termination or expiration shall also survive termination or expiration of this Agreement.

(f) **Binding Effect and Third-Party Beneficiary. Waiver of Rights.** Except where specifically stated to the contrary, all remedies available to either Party for breach of this Agreement under this Agreement, at law, or in equity, are cumulative and nonexclusive. A waiver or failure of either Party at any time to require performance by the other Party of any provision hereof will not affect the full right to require such performance at any time thereafter.

(g) **Injunctive Relief.** If either Party breaches any material provision of this Agreement, the non-breaching Party shall be entitled, in addition to any other rights available under this Agreement or at law or in equity, to apply for immediate injunctive relief without any requirement to post a bond or other security and the parties agree to not contest such application.

(h) **Severability.** If any provision or portion thereof of this Agreement or its application in a particular circumstance is held to be invalid or unenforceable to any extent in any jurisdiction, such provision or portion thereof will, as to such jurisdiction only, be ineffective to the extent of such unenforceability, all other provisions and provisions  of this Agreement will not be affected thereby and will remain valid and enforceable to the fullest extent permitted by applicable law.

(i) **Choice of Law and Venue.** This Agreement, as well as any and all contractual and tort claims arising from this Agreement or arising from any of the proposals, negotiations, communications or understandings relating to this Agreement, will be exclusively governed by and construed in accordance with the laws of the State of Nevada, United States of America ("Nevada"), applicable to contracts, and this Agreement is agreeably made by the Parties entirely within Nevada and wholly performed in Nevada, without regard to any conflict or choice of law principles. The sole jurisdiction and venue for any litigation arising out of this Agreement will be an appropriate federal or state court located in Clark County, Nevada.

(j) **Force Majeure.** Any failure or delay by either Party in the performance of its obligations pursuant to this Agreement will not be deemed a default or breach of the Agreement or a ground for termination to the extent such failure or delay is due to computer or Internet or telecommunications breakdowns, denial of service attacks, fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil unrest, rebellions or revolutions in the United States or any nation where the obligations under this Agreement are to be executed, strikes, supplier and third party failure, lockouts, or labor difficulties, or any similar cause beyond the reasonable control of the party.

(k) **Headings.** The numbering and captions of the various sections comprising this Agreement are solely for convenience and reference, and shall not affect the scope, meaning, intent or interpretation of the provisions of this Agreement nor shall such headings otherwise be given any legal effect.

(l) **Enforceability of Recitals.** The Recitals in this Agreement are incorporated by reference as part of this Agreement and therefore binding upon and enforceable by the Parties.

(m) **Entire Agreement.** This Agreement contains the final and entire agreement of the Parties and supersedes all previous and contemporaneous verbal or written negotiations, understandings, or agreements regarding the Agreement's subject matter.

(n) **Additional Collateral**. In the event any risks or events that could negatively affect the interests of the Seller, including without limitation the value of the Share Collateral or the price of Bitcoin, the Buyer agrees to immediately notify the Seller in writing and the Seller reserves the right to request and the Buyer agrees to pay an additional amount of Collateral to cover any shortfall in the coverage of the Share Collateral.

(o) **Adequate Assurances.** Buyer agrees that within seven (7) business days of the Effective Date, it shall provide a mutually satisfactory letter from its counsel for Buyer's separate fund based based in Luxembourg verifying the timing and amount of the funds capitalization to provide further confidence in Buyer's overall liquidity and ability to remit Payment in Full.

(p) **Entire Agreement.** This Agreement contains the final and entire agreement of the Parties and supersedes all previous and contemporaneous verbal or written negotiations, understandings, or agreements regarding the Agreement's subject matter.

**IN WITNESS WHEREOF,** the Parties' authorized representatives have executed this Agreement as of the Effective Date first written above.

**BUYER**                              **SELLER**

**By:** David (Gaian) Schachtschneider
401683A5D3614BF...

**Name:** David Schachtschneider
**Capacity:** Personally

**By:** Stefan Grafstein
786DEC3BB75C430...

**Name:** Stefan Grafstein
**Capacity:** Personally

**By:** David (Gaian) Schachtschneider
401683A5D3614BF...

**Name:** David "Gaian" Schachtschneider
**Capacity:** Principal of Impact Energy Partners, LLC

# EXHIBIT 2

# EXHIBIT 2

# AMENDMENT TO COLLATERALIZED PRIVATE PURCHASE AGREEMENT

This Amendment to Collateralized Private Purchase Agreement (the "**Amended Agreement**") is entered into on 3/17/22 (the "**Effective Date**"), by and among David "Gaian" Schachtschneider, personally, and as authorized signatory for Impact Energy Partners, LLC, a limited liability company (collectively, the "**Buyer**"), with its principal address at 340 S. Lemon Ave., Suite 1964, Walnut, CA, 91789; Sahil Singh ("**Guarantor**"), with an address of 3140 La Ventana Pkwy, Driftwood TX 78619, **in the first part**, and Stefan Grafstein (the "**Seller**"), with a mailing address of 220 Calle Manuel Domenech #750, San Juan, Puerto Rico 00918 **in the second part**. For purposes of this Agreement, Buyer, Seller, and Guarantor each will be referred to individually as a "Party" and together as the "Parties." This Amended Agreement amends in part the prior executed Collateralized Private Purchase Agreement ("Original Agreement") between the Buyer and Seller dated on or about December 24, 2021.

**WHEREAS,** Buyer previously agreed as part of the Original Agreement to purchase and Seller agreed to sell Bitcoin (the "Digital Assets") valued in the amount of two million dollars ($2,000,000.00 USD) at the time of its transfer by Seller to Buyer pursuant to the terms reflected in the Original Agreement, which is still fully enforceable but amended to a limited extent as set forth in this Amended Agreement;

**WHEREAS,** Seller transferred all Bitcoin valued in the amount of two million dollars ($2,000,000.00 USD) to the Buyer on or about December 25, 2021;

**WHEREAS,** Buyer pledged Collateral Shares to secure the purchase transaction in the form of his single-class of full voting registered shares, free and clear of any encumbrances and fully in his direct personal/company ownership, of Star Scientific Limited, an Australian public company with its principal office located at Suite 3.01, Level 3, 828 Pacific Highway, Gordon NSW 2072, Australia (the "Issuer");

**WHEREAS,** the purpose of the Original Agreement was to structure, bind, and constructively assist Buyer and Seller in successfully transacting a sale of the Digital Assets at a premium to market within a specific amount of time, according to specific steps, and with terms supportive of the minimization of transaction risk and maximization of transaction value for Buyer and Seller alike;

**WHEREAS,** Buyer has breached the Original Agreement by not timely making any payments or a payment in full as agreed to within the Original Agreement and as further agreed to in subsequent discussions among the Parties, including the Guarantor; and

**FINALLY WHEREAS,** The Parties have agreed to partially amend the Original Agreement to create additional consideration, assurances and security for the Seller and his co-investors to allow additional time for the Seller or his Guarantor to perform under the Original Agreement, as partially amended by this Amended Agreement.

**NOW, THEREFORE,** in exchange for these acts, promises and mutual covenants contained herein, along with other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer, Seller and Guarantor further agree as follows:

## 1. Admission of Default and Breach

In the Original Agreement it is stated that Buyer's default occurs thirty-one days after the Bitcoin was originally transferred from the Seller to the Buyer, which occurred on December 25, 2021. The Buyer hereby admits to being in full default and breach of the Original Agreement due to non-payment. Among other things, the Original Agreement states that payment was required to be made by no later than 30 days following the transfer of Bitcoin from Seller to Buyer. The Original Agreement also stated that there is a $400,000 penalty due to the Seller for every 30-day period the $2,000,000 sale proceeds plus the owed 20% interest is not paid by Buyer. At the time of this Amended Agreement, neither the Buyer nor the Guarantor has made any payment to the Seller.

## 2. Additional Consideration for Extension of Time to Pay in Full

The Parties agree that the Original Agreement is hereby amended, in part, to state that the total amount to be paid on or before March 26th by either the Buyer or the Guarantor shall include, starting on February 25th (Day 61), compounded interest daily based on the 20% per month interest agreed upon in the original contract. Beginning on day 61, this 20% interest will be computed daily at 0.67% per day, compounded based on the total outstanding debt amount ("Modified Sale Proceeds"). As of day 61, the total outstanding debt ("Modified Sale Proceeds") amount before compounding interest is $3,600,000. This amount consists of the original $2,000,000 in sales proceeds, the original agreed upon 20% interest of $400,000 per month, the additional agreed upon penalties of $400,000 for each 30 days beyond the due date of January 26, 2022.

The Parties also agree that in the event there is another default by the Buyer or the Guarantor, the Buyer and Guarantor jointly and severally agree to pay an additional $400,000 in penalties for every thirty days thereafter along with an additional 0.67% daily compound interest on the total outstanding amount per day in which the total amounts from the Buyer or Guarantor remain unpaid.

As consideration for Seller's agreement to provide more time to the Buyer or Guarantor to make full payment under the Original Agreement and this Amended Agreement, the Parties agree that the payment due date will be extended until ninety days following the transfer of the Bitcoin from the Seller to the Buyer. For the removal of doubt, a further breach of the Agreement and default will occur on date 91 following the date of execution, March 27, 2022, which will result in a third $400,000 penalty to be owed to the Seller by the Buyer and Guarantor in the event Seller does not pay the Buyer timely under this Agreement. This penalty will be applied again 120 days following the transfer of the Bitcoin by Seller to Buyer and continue for every 30 day period thereafter, per the Original Agreement. Going forward and beginning on the 61st day following the sale of Bitcoin to the Buyer, an additional 0.67% interest compounded daily will continue to accrue until the 90th day following the execution of the Original Agreement.

## 3. Guarantee from Guarantor

The Parties have been in communications with a third-party beneficiary of the Bitcoin sold in the Original Agreement, Guarantor, who has agreed to serve as the Buyer's Guarantor such that in the event the Buyer breaches the Original Agreement as partially amended by the Amended Agreement, the Guarantor agrees to immediately pay all amounts owed by the Buyer under the Original Agreement as amended by this Amended Agreement.

## 4. Additional Collateral

The Parties further agree that if the principle interest and penalties have not been paid in full by the end of March, additional collateral will be provided by the Buyer and the Guarantor if needed to continue provide the over collateralization of the balance owed as agreed in the original contract. To avoid further defaults and material breaches of contract, the buyer and guarantor will need to provide additional collateral, which is satisfactory to the seller.

## 5. Attorney's Fees & Costs

The Parties agree to pay all attorney's fees and costs associated with any breaches of the Original Agreement and the Amended Agreement or any litigation matters that shall occur in any effort to recover the amounts due to the Seller under the Original Agreement as amended by the Amended Agreement.

## 6. Seller's Co-Investors

The Parties agree that the Seller's co-investors, and their heirs and assigns ("Co-investors"), are hereby granted all rights granted to the Seller under the Original Agreement and the Amended Agreement such that each Co-investor shall have all rights to bring any actions against the Buyer and Guarantor in any way related to the Original Agreement and the Amended Agreement as joint and several parties.

## 7. Continued Enforceability of Original Agreement

The Parties agree that apart from the amendments set forth in this Amended Agreement, which supersede and supplant any contrary or conflicting provisions of the Original Agreement, all remaining aspects of the Original Agreement shall continue to be fully enforceable against both the Buyer and the Guarantor, jointly and severally.

## 8. Further Default

**(i)** If either Buyer or the Guarantor have not remitted all payments owed under this

Amended Agreement in full amount to Seller pursuant to the terms of this Amended Agreement, Seller, along with the Co-investors, at their option may deliver written notice of default ("Notice of Default") to Buyer of their intention to liquidate the Collateral Shares and foreclose on the Additional Collateral, and Seller shall repurchase the Collateral Shares by tendering the then current amount due to Seller as partial payment. Failure by Buyer to remit the then payment amount shall entitle Seller to commence court action against the Buyer and Guarantor to recover all amounts due under the Original Agreement and Amended Agreement, along with any costs incurred by Seller due to Buyer's and Guarantor's default and breach, including without limitation all attorneys' fees and legal expenses.

**(ii)** Buyer acknowledges and agrees that in the event Seller initiates litigation for recovery of its damages, including without limitation the amounts due, sale of collateral and foreclosure on the Additional Collateral and legal fees incurred in connection with the recovery of its damages, Buyer shall tender an executed stipulation to Seller for counter-signature agreeing to the entry of Final Judgment by Seller and further agrees to not otherwise contest Seller's legal action or complaint, provided that all amounts due to the Seller under the Original Agreement and the Amended Agreement have not been remitted to Seller pursuant to the terms of the Original Agreement and this Amended Agreement.

**(iii)** Buyer further acknowledges and agrees that in the event of a civil action commenced by Seller for recovery of any or all of the amounts due to Seller under the Original Agreement or this Amended Agreement, Buyer will be responsible for reimbursing Seller for any and all attorneys' fees and all other costs and expenses associated with such legal action and recovery of its damages and losses pursuant to this Agreement.

9. **Miscellaneous.**

(a) **Notice.** All notices to a party hereunder shall be in writing, and delivered by certified mail, return receipt requested, overnight courier service, electronic mail, or by facsimile with confirmation by the above-described mailing methods to the address(es) set forth in the first part of this Amended Agreement, or to a different address which a Party may give written notice of pursuant to this Section, including without limitation electronic mail or message. Notice will be deemed delivered and received on the date it is actually received by the recipient party.

(b) **Amendment.** This Amended Agreement may not be amended except in writing, executed by each respective party or their authorized representatives and signatories.

(c) **Assignment.** Unless stated otherwise, this Agreement is not transferable, assignable, or delegable by Buyer or Seller in whole or in part, without the prior written permission of the other Party. This Amended Agreement will be binding upon and inure to the benefit of the Parties and their respective successors, trustees, administrators, and assigns as permitted hereunder. Seller has the option to syndicate the participation in this transaction.



(d) **Survival.** Any obligations or rights of the Parties created or agreed to under this Amended Agreement that either party would reasonably expect the other to continue to respect and observe will survive termination or expiration of this Amended Agreement for any reason. In addition, any payment obligations of the Buyer and Guarantor that accrue prior to such termination or expiration shall also survive termination or expiration of this Agreement.

(e) **Binding Effect and Third-Party Beneficiary. Waiver of Rights.** Except where specifically stated to the contrary, all remedies available to either Party for breach of this Amended Agreement under this Amended Agreement, at law, or in equity, are cumulative and nonexclusive. A waiver or failure of either Party at any time to require performance by the other Party of any provision hereof will not affect the full right to require such performance at any time thereafter.

(f) **Injunctive Relief.** If either Party breaches any material provision of this Amended Agreement, the non-breaching Party shall be entitled, in addition to any other rights available under this Amended Agreement or at law or in equity, to apply for immediate injunctive relief or foreclosure without any requirement to post a bond or other security and the parties agree to not contest such application.

(g) **Severability.** If any provision or portion thereof of this Amended Agreement or its application in a particular circumstance is held to be invalid or unenforceable to any extent in any jurisdiction, such provision or portion thereof will, as to such jurisdiction only, be ineffective to the extent of such unenforceability, all other provisions and provisions of this Amended Agreement will not be affected thereby and will remain valid and enforceable to the fullest extent permitted by applicable law.

(h) **Choice of Law and Venue.** This Amended Agreement, as well as any and all contractual and tort claims arising from this Amended Agreement or arising from any of the proposals, negotiations, communications or understandings relating to this Amended Agreement, will be exclusively governed by and construed in accordance with the laws of the State of Nevada, United States of America ("Nevada"), applicable to contracts, and this Agreement is agreeably made by the Parties entirely within Nevada and wholly performed in Nevada, without regard to any conflict or choice of law principles. The sole jurisdiction and venue for any litigation arising out of this Agreement will be an appropriate federal or state court located in Clark County, Nevada.

(i) **Force Majeure.** Any failure or delay by either Party in the performance of its obligations pursuant to this Amended Agreement will not be deemed a default or breach of the Amended Agreement or a ground for termination to the extent such failure or delay is due to computer or Internet or telecommunications breakdowns, denial of service attacks, fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil unrest, rebellions or revolutions in the United States or any nation where the obligations under this Amended Agreement are to be executed, strikes, supplier and third party failure, lockouts, or labor difficulties, or any similar cause beyond the reasonable control of the party.

(j) **Headings.** The numbering and captions of the various sections comprising this Amended Agreement are solely for convenience and reference, and shall not affect the scope, meaning, intent or interpretation of the provisions of this Amended Agreement nor shall such headings otherwise be given any legal effect.

(k) **Enforceability of Recitals.** The recitals in this Amended Agreement are enforceable by the Parties.

(l) **Entire Agreement.** Other than the provisions of the Original Agreement that are still fully enforceable to the extent they do not conflict with the provisions of this Amended Agreement, this Amended Agreement contains the final and entire agreement of the Parties.

(m) **Additional Collateral**. In the event any risks or events that could negatively affect the interests of the Seller, including without limitation the value or availability of the Share Collateral, the value or the availability of the Additional Collateral or the price of Bitcoin, the Buyer agrees to immediately notify the Seller in writing and the Seller reserves the right to request and the Buyer agrees to pay an additional amount of Collateral or good faith payments to cover any shortfall in the coverage of the Share Collateral and Additional Collateral.

(n) **Entire Agreement.** This Amended Agreement contains the final and entire agreement of the Parties and supersedes all previous and contemporaneous verbal or written negotiations, understandings, or agreements regarding the Agreement's subject matter.

**IN WITNESS WHEREOF,** the Parties' authorized representatives have executed this Amended Agreement as of the Effective Date first written above.

**BUYER**

By: _David Schachtschneider_
Name: David Schachtschneider
Capacity: Personally

By: _David Schachtschneider_
Name: David "Gaian" Schachtschneider
Capacity: As Principal of Energy Partners, LLC

**SELLER**

By: _Stefan Grafstein_
Name: Stefan Grafstein
Capacity: Personally and on behalf of his co-investors

**GUARANTOR**

By: _____
Name: Sahil Singh
Capacity: Personally, and on behalf of all of his business entities and interests

# EXHIBIT 3

# EXHIBIT 3

## PRIVATE PURCHASE AGREEMENT

This Agreement is entered into on 3/25/22 (the "**Effective Date**"), by Sahil Singh ("**Buyer**"), with an address of 3140 La Ventana Pkwy, Driftwood TX 78619, and Stefan Grafstein (the "**Seller**"), with a mailing address of 220 Calle Manuel Domenech #750, San Juan, Puerto Rico 00918.

**WHEREAS,** Buyer desires to purchase and Seller has agreed to sell Five point four one (5.41) Bitcoin (the "Digital Assets") in exchange for seven hundred forty thousand U.S. dollars ($740,000.00 USD) by Seller to Buyer pursuant to the terms reflected in this Agreement;

**WHEREAS,** the purpose the agreement is to structure, bind, and constructively assist a Buyer and Seller in successfully transacting a sale of the Digital Assets at a premium to market within a specific amount of time, according to specific steps, and with terms supportive of the minimization of transaction risk and maximization of transaction value for Buyer and Seller alike;

**WHEREAS,** Buyer and Seller each desire to engage in transactions of a similar nature in the future provided that each is satisfied with the mechanics and result of the initial transaction to be executed between the parties for the purchase and sale of the Digital Assets contemplated herein;

**NOW, THEREFORE,** in exchange for these promises and mutual covenants contained herein, along with other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller agree as follows:

1. **Buyer's Purchase of Digital Assets and Pledge of Collateral Shares.**

   (a) **Purchase of Digital Assets.** Buyer shall pay the Seller, as the total purchase price for the Digital Assets an amount equal to seven hundred forty thousand U.S. dollars ($740,000.00 USD) ("the Purchase Price"). The Purchase Price shall be paid to Seller within five (5) calendar days of Seller's transfer of the Digital Assets to Seller according to written transfer instructions, including Buyer's Bitcoin wallet address, and wire instructions, which Buyer shall provide to Seller promptly following the parties' execution of this Agreement. In the event that Buyer fails to remit payment of the Purchase Price in full to the Seller within 4 days of the Seller's transfer of the Digital Assets within dour (5) five, the penalties set forth in Paragraph 1(b) below shall apply.

   (b) **Late Payment; Default.** In the event that Buyer is unable or fails to remit Payment in Full to Seller within five (5) days of receipt of the Digital Assets, the buyer is considered to be in default of this agreement and the following late fees shall apply: Compounding interest at 1% per day based on the seven hundred forty thousand U.S. dollars ($740,000.00 USD) amount and on interest and penalties that may accrue due to nonpayment. Any partial payments will reduce the balance due and 1% per day compounding interest will continue to accrue on remaining interest, penalties and principle balance.

       (i) If Buyer has not remitted the Payment in Full amount to Seller within 15 days following the day upon which Seller actually received possession of the Digital Assets from Seller to its Bitcoin wallet address, Seller at its option may deliver written notice of default ("Notice of Default") to Buyer of its intention to commence court action to recover the

Payment in Full amount, along with any costs incurred by Seller due to Buyer's default, including without limitation all attorneys' fees and legal expenses.

(ii) Buyer further acknowledges and agrees that in the event of a civil action commended by Seller for recovery of any or all of the amount comprising the Payment in Full amount due Seller at such time, Buyer will be responsible for reimbursing Seller for any and all attorneys' fees and all other costs and expenses associated with such legal action and recovery of its damages and losses pursuant to this Agreement.

**2. Term and Termination.**

**(a) Term.** This Agreement shall be effective as of the Effective Date and continue in full force and effect for a period of twelve (12) months, or until each party has completed its performance of all obligations contemplated hereunder prior to the conclusion of the Term, unless extended in writing, executed by authorized representatives of the parties, or otherwise terminated earlier in accordance with this Section.

**(b) Termination.** This Agreement may be terminated by the parties as follows:

(i) By mutual written agreement of the parties at any time;

(i) By the non-breaching party for "Cause." Cause means a material breach of this Agreement by either party that has not been cured within ten (10) calendar days after delivery of written notice of the material breach (the "Material Breach") to the breaching party by the non-breaching party specifying the nature of the Material Breach and the specific actions required to be undertaken by the breaching party to correct the breach as soon as commercially possible. If this Agreement is terminated for Cause, the effective date of termination shall be ten (10) calendar days after written notice of the material breach is provided by the non-breaching party, unless the breach is remedied prior to the expiration of ten (10) calendar days.

(ii) By either party effective immediately if the other party becomes insolvent, seeks protection under the federal bankruptcy law, or becomes subject to liquidation or receivership proceeding; or at such time that the performance obligations of the Consultant pursuant to this Agreement have been completed in their entirety and the parties agree to enter into a subsequent written agreement under new terms for the ongoing transactions between the parties, or the parties elect to cease or retire the relationship initiated and/or contemplated under this Agreement prior initiation or following completion of the performance obligations required of each party as contemplated hereunder.

**2. Confidential Information.**

(a) **Mutual Nondisclosure.** Neither party shall use or disclose the other party's Confidential Information (as hereinafter defined) except as expressly authorized by this Agreement, and each party shall protect all such Confidential Information using the same degree of care that

such party undertakes with respect to the protection and security of its own proprietary and Confidential Information, but in no event with safeguards less than a reasonably prudent business or non-profit organization would exercise under similar circumstances in connection with its own Confidential Information,

(b) **Definition of Confidential Information.** "Confidential Information" means : (i) the terms of this Agreement, technology, ideas, know-how, documentation processes, algorithms and trade secrets embodied in the Software licensed to Client pursuant to this Agreement, and (ii) any other information whether disclosed orally, visually, or in written or digital media that is identified as "confidential," "proprietary," or similarly at the time of such disclosure.

(c) **Exclusions.** For the avoidance of doubt, Confidential Information shall not include any information that is:

    (i)   published or otherwise available to the public other than by breach of this Agreement;

    (ii)   rightfully received from a third party without confidential limitations;

    (iii)   independently developed as evidenced by appropriate records;

    (iv)   known to the party prior to its first receipt of same from the other party as evidenced by appropriate records;

    (v)   hereinafter disclosed by the disclosing party to a third party without restriction on disclosure; or

    (vi)   approved for public release by written authorization by the disclosing party.

(d) **Legal Disclosure.** If any Confidential Information must be disclosed to any third party by reason of any legal, accounting or regulatory requirement beyond the reasonable control of said party, that party shall promptly notify the other party of such requirement, permit the other party (at its own expense) to seek an appropriate protective order from a court of competent jurisdiction, and cooperate with the other party in its efforts to do so.

## 2. **Mutual Indemnification.**

(a) The parties shall indemnify, defend and hold harmless the other party and its officers, directors, shareholders, members, managers, employees and agents, from and against any and all third-party claims, damages, liabilities, costs and expenses, including reasonable attorneys' fees and court costs, arising out of or in connection with (i) any material breach of this Agreement; (ii) the negligence or willful misconduct of the other party; or (iii) the other party's noncompliance with applicable laws and regulations.

(b) Each party's indemnification obligations under this Section shall be subject to: (i) receiving prompt written notice of the existence of any legal action described in subsection (a) or (b); (ii) control of the defense of such legal action; (iii) permitting the indemnified party to participate in the defense of any such legal action; and, (iv) receiving full cooperation of the indemnified party in the defense of any such legal action.

3. **Representations and Warranties.**

    (a)    **Seller's Representations and Warranties.** Seller represents and warrants to Buyer that it owns all right, title, and interest in, or otherwise has full right and authority to transfer, convey, and sell any Digital Assets sent to Buyer's Bitcoin wallet address pursuant to this Agreement. Further, Seller acknowledges and agrees that it shall take all reasonable action reasonable and necessary to reconvey any Collateral Shares conveyed to it as part of this transaction beginning on the first business day following Buyer's remittance in full of the Purchase Price to Seller along with any additional amount due to Seller as a late fee or penalty incurred due to Seller's failure to remit payment within thirty (30) days of receipt of the Digital Assets to its Bitcoin wallet address as prescribed hereunder.

    (b)    **Buyer's Representation's and Warranties.** Buyer represents and warrants to Seller that it owns all right, title, and interest in, or otherwise has full right and authority to transfer, convey, and sell any Collateral Shares provided to Buyer to secure the transaction contemplated hereunder. Buyer further represents and warrants that it shall make all commercially reasonable efforts to remit in full the Purchase Price to Seller within thirty (30) days of receipt of the Digital Assets. However, in the event that Seller is unable or fails to remit payment within the thirty (30) days of receipt of the Digital Assets to its Bitcoin wallet address, Seller agrees to pay to Buyer any late fees or penalties as prescribed hereunder in addition to the full Purchase Price.

    (c)    **Limitation of Warranty.** Except for the express representations and warranties stated in this agreement, consultant makes no warranties whatsoever. The parties explicitly disclaims any other warranties of any kind, either express or implied, including but not limited to warranties of merchantability or fitness for a particular purpose or compliance with laws or government rules or regulations applicable to the transaction(s) contemplated under this Agreement.

4. **Miscellaneous.**

    (a)    **Notice.** All notices to a party hereunder shall be in writing, and delivered by certified mail, return receipt requested, overnight courier service, electronic mail, or by facsimile with confirmation by the above described mailing methods to the address(es) set forth in the first part of this Agreement, or to a different address which a party may give written notice of pursuant to this Section, including without limitation electronic mail or message. Notice will be deemed delivered and received on the date it is actually received by the recipient party.

    (b)    **Amendment.** This Agreement may not be amended except in writing, executed each respective party or their authorized representatives and signatories.

    (c)    **Assignment.** This Agreement is not transferable, assignable, or delegable by Buyer or Seller in whole or in part, without the prior written permission of the other party. This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, trustees, administrators, and assigns as permitted hereunder. Under no circumstances shall either party hereto be held liable for claims asserted by any third party.

    (d)    **Survival.** Any obligations or rights, including without limitation rights to Intellectual Property, of the parties created or agreed to under this Agreement that either party would reasonably expect the other to continue to respect and observe will survive termination or expiration of this Agreement for any reason. In addition, any payment obligations of Client

that accrue prior to such termination or expiration shall also survive termination or expiration of this Agreement.

(e) **Binding Effect and Third-Party Beneficiary. Waiver of Rights.** Except where specifically stated to the contrary, all remedies available to either party for breach of this Agreement under this Agreement, at law, or in equity, are cumulative and nonexclusive. A waiver or failure of either party at any time to require performance by the other party of any provision hereof will not affect the full right to require such performance at any time thereafter.

(f) **Injunctive Relief.** If either party breaches any material provision of this Agreement, the non-breaching party shall be entitled, in addition to any other rights available under this Agreement or at law or in equity, to apply for immediate injunctive relief without any requirement to post a bond or other security and the parties agree to not contest such application.

(g) **Severability.** If any provision or portion thereof of this Agreement or its application in a particular circumstance is held to be invalid or unenforceable to any extent in any jurisdiction, such provision or portion thereof will, as to such jurisdiction only, be ineffective to the extent of such unenforceability, all other provisions and provisions of this Agreement will not be affected thereby and will remain valid and enforceable to the fullest extent permitted by applicable law.

(h) **Choice of Law and Venue.** This Agreement, as well as any and all contractual and tort claims arising from this Agreement or arising from any of the proposals, negotiations, communications or understandings relating to this Agreement, will be governed by and construed in accordance with the laws of the State of Nevada, United States of America ("Nevada"), applicable to contracts made entirely within Nevada and wholly performed in Nevada, without regard to any conflict or choice of law principles. The sole jurisdiction and venue for any litigation arising out of this Agreement will be an appropriate federal or state court located in Clark County, Nevada.

(i) **Force Majeure.** Any failure or delay by either party in the performance of its obligations pursuant to this Agreement will not be deemed a default or breach of the Agreement or a ground for termination to the extent such failure or delay is due to computer or Internet or telecommunications breakdowns, denial of service attacks, fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil unrest, rebellions or revolutions in the United States or any nation where the obligations under this Agreement are to be executed, strikes, supplier and third party failure, lockouts, or labor difficulties, or any similar cause beyond the reasonable control of the party.

(j) **Headings.** The numbering and captions of the various sections comprising this Agreement are solely for convenience and reference, and shall not affect the scope, meaning, intent or interpretation of the provisions of this Agreement nor shall such headings otherwise be given any legal effect.

(k) **Entire Agreement.** This Agreement contains the final and entire agreement of the parties and supersedes all previous and contemporaneous verbal or written negotiations, understandings, or agreements regarding the Agreement's subject matter.

*[SIGNATURE PAGE FOLLOWS]*

**IN WITNESS WHEREOF,** the Parties' authorized representatives have executed this
Agreement as of the Effective Date first written above.

**BUYER**

By:_____

Name: Sahil Singh

Capacity: Personal

**SELLER**

By:_____

Name: Stefan Grafstein

Capacity: Personal

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 515 S. Flower St., 18th Floor, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*): **PARTIAL JOINDER BY SECURED CREDITOR PMF CA REIT, L.L.C. IN THE UNITED STATES TRUSTEE'S MOTION TO DISMISS OR CONVERT CHAPTER 11 CASE** will be served or was served in the manner indicated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 10/24/2022 , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- John A. Vos InvalidEMailECFonly@gmail.com
- Jacquelyn H. Choi jacquelyn.choi@rimonlaw.com
- United States Trustee (SF) ustpregion17.sf.ecf@usdoj.gov; Elvina.rofael@usdoj.gov

☐    Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐    Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____ I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 10/24/2022 | Jennifer R. Tullius | /s/ *Jennifer R. Tullius* |
| *Date* | *Printed Name* | *Signature* |

PARTIAL JOINDER TO UST'S MOTION TO CONVERT OR DISMISS